Loren J. LARSON, Jr., Appellant,

v.

Allen COOPER, Director, Division of Institutions, State of Alaska, Dep't of Corrections and Garland Armstrong, former Superintendent of the Spring Creek Correctional Center, Appellees.

Loren J. Larson, Jr., Appellant,

v.

Allen Cooper, Director, Div. of Institutions, State of Alaska, Dept. of Corrections and Larry Davis, Correctional Officer, Spring Creek Correctional Center, Appellees.

Nos. S–10327, S–10431.

Supreme Court of Alaska.

March 5, 2004.

Rehearing Denied May 25, 2004.

Loren J. Larson, Jr., pro se, Seward.

Timothy W. Terrell, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellees.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Does a prison violate a maximum security prisoner's constitutional rights by limiting his physical contact with his wife to a brief kiss and embrace at the beginning and end of her visits? In S–10327, we hold that the free exercise of religion clause of the federal constitution does not require the prison to allow hand-holding, kissing, and embracing throughout the visit, because we conclude that the visitation rules are reasonably related to legitimate penological objectives. We also hold that the free exercise clause of the Alaska Constitution does not require the prison to permit these activities, because we conclude that they would threaten the state's compelling interest in maintaining institutional security. In S–10431, we reject the prisoner's due process claims, because we hold that the temporary interruption of contact visitation did not interfere with a protectable liberty interest.

## II. FACTS AND PROCEEDINGS

### A. Events Surrounding the Visitation and Discipline

Loren J. Larson, Jr. is a maximum security prisoner at Spring Creek Correctional Center in Seward, an Alaska Department of Corrections (DOC) facility. In 1999 the correctional center revised the rules governing contact visitations to prohibit all physical contact between prisoners and visitors other than "a short embrace upon initial contact and again upon departure." Prior to this rule revision, handholding was permitted during visitation.

According to a civil complaint later filed by Larson, he and his wife joined hands in prayer during a contact visit on September 20, 1999. Correctional Officer Larry Davis was monitoring Larson's visit. Officer Davis determined that Larson's conduct violated Spring Creek's visitation rules prohibiting hand holding, and he ordered Larson to release his wife's hand. Larson refused, and Davis terminated the visit. Davis filed a disciplinary incident report describing Larson's refusal to obey a direct order. As a result of this incident, Larson's contact visitation privileges were suspended, and he was restricted to secure visitation.

On October 4, 1999 the prison disciplinary committee found Larson not guilty of disobeying a direct order. Nevertheless, prison officials continued to restrict Larson to secure visitation until December 1999.

### B. Proceedings in S–10431

Larson filed several grievances and appeals challenging the disruption of his visit with his wife and the temporary suspension of contact visitation; all were denied by the Alaska Department of Corrections. Larson then filed a superior court administrative appeal in December 1999 in which he contended that "[t]he actions of [DOC] officials are violative of their own policy and procedures governing disciplinary [matters], use of individualized determination, [and] visitation." The superior court converted Larson's appeal against Officer Davis and Allen Cooper, the Director of Institutions for the Department of Corrections, into an original civil action in August 2000.

Larson's complaint against Cooper and Davis alleges that Officer Davis violated Larson's free exercise of religion and due process rights under the federal and state constitutions when Davis ordered Larson to release his wife's hand during their visit. It also alleges that Cooper violated those rights when he refused to reinstate Larson's contact visitation privileges. It also claims that DOC violated its own procedures for altering rules. The complaint sought a declaration that Davis and Cooper violated his rights by terminating his September 20, 1999 contact visit. It also sought an injunction ordering DOC to apologize to Larson's wife and to begin annual testing of corrections officers on their knowledge of standard operating procedures for visitation, and requested compensatory and punitive damages.

Both sides in Larson's suit against Cooper and Davis moved for summary judgment. Superior Court Judge Peter A. Michalski granted summary judgment to the defendants and dismissed Larson's claims. Larson's appeal from this ruling is before us in Supreme Court File No. S–10431.

### C. Proceedings in S–10327

In January 2000 Larson asked Spring Creek Superintendent Garland Armstrong for permission to conduct a "religious visit" with his wife; as described by Larson, the visit would have included extensive contact prohibited by Spring Creek's visitation rules:

> I request approval to receive a religious visit from my wife on 2–19–00 6:30 to 9:00 pm. This visit is in compliance to our Christian Faith in maintaining the institution of marriage.
>
> Activities will include reading from the New International Readers Version Bible, Kneeling in prayer to our Lord and Savior Jesus Christ, Embracing for long periods of time and when needed, holding of hands and kissing. All of these activities are fundamental in our Christian Faith to maintain our marriage. The attorney visiting room will be needed for this visit. If needed, my wife will agree to a strip search in accordance to Policy and Procedure (810.02) to alleviate any security concerns.

Larson's request was denied, as were his subsequent grievance and appeal to Allen Cooper.

Larson filed a superior court complaint in April 2000 alleging that Superintendent Armstrong and Director Cooper violated his religious free exercise rights guaranteed by the United States and Alaska Constitutions as well as the Religious Freedom Restoration Act of 1993 (RFRA).[1] His complaint also alleges that the defendants violated his right,

---

1. 42 U.S.C. § 2000bb et seq. (2000).

guaranteed by the Alaska Constitution, to rehabilitation. Larson requested declaratory and injunctive relief. Both sides moved for summary judgment. Judge Michalski granted the defendants' motion, and held, among other things, that Spring Creek's visitation rules limiting physical contact were narrowly tailored to achieve the state's compelling interest in reducing the influx of contraband. Larson's appeal from this ruling is before us in Supreme Court File No. S–10327.[2]

### D. Consolidation

Larson also has a third appeal, Supreme Court File No. S–10708, pending before us. Cooper and Spring Creek Assistant Superintendent Thomas Reimer are the appellees in that appeal. Larson there contends that Reimer restricted Larson's visitation privileges in retaliation for the finding of the prison disciplinary committee that Larson was not guilty of disobeying Davis's order to release his wife's hand. Cooper, Armstrong, Reimer, and Davis moved to consolidate the three appeals. Larson opposed consolidation. We issued an order on March 25, 2003, stating that we would consolidate S–10327 and S–10431, but that we would address S–10708 in a separate disposition.

### III. DISCUSSION

We hold in these two appeals that the superior court properly granted summary judgment to the defendants on Larson's claims.[3] We first consider in S–10327 whether Spring Creek's limitations on contact visits satisfy the free exercise clauses of the Federal and state Constitutions. We then

consider whether the rehabilitation right guaranteed by the Alaska Constitution entitles a maximum security prisoner to have extensive physical contact with visitors. In S–10431, we consider whether Davis and Cooper violated Larson's due process rights; this inquiry requires us to decide whether the temporary restriction of Larson's contact visitation privileges implicated a protectable liberty interest.

### A. Larson's Free Exercise and Rehabilitation Claims in S–10327

#### 1. The superior court did not err in holding that Spring Creek's visitation rules do not violate the Federal Free Exercise Clause.

■ Defendants Cooper and Armstrong discuss two possible standards for analyzing Larson's federal free exercise claim. We need not decide which is the correct standard because Spring Creek's visitation rules satisfy either standard.[4]

#### a. The *Smith* test

The United States Supreme Court held in *Employment Division, Department of Human Resources v. Smith* that a neutral, generally applicable law or regulation does not offend the free exercise clause even if the law has an incidental—i.e., unintended—effect on religious practice.[5] As defendants contend, Spring Creek's visitation rules are unquestionably constitutional under this standard: they do not discriminate against religion on their face. They apply to all prisoners, and Larson has not claimed that the rules are aimed at a particular religion.[6]

---

2. Larson no longer contends that the RFRA affords grounds for relief in his suit against Armstrong and Cooper. The United States Supreme Court held the RFRA unconstitutional in *City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

3. "We review a grant of summary judgment *de novo.* All reasonable factual inferences are drawn in favor of the non-moving party to determine whether genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law." *Wongittilin v. State,* 36 P.3d 678, 680 (Alaska 2001) (original emphasis) (internal quotation and citation omitted). In reviewing questions of law, we apply our independent judgment and adopt the rule of

law that is most persuasive in light of precedent, reason, and policy. *Mathis v. Sauser,* 942 P.2d 1117, 1120 (Alaska 1997).

4. Cf. *Hines v. South Carolina Dep't of Corr.,* 148 F.3d 353, 357 (4th Cir.1998) (declining to address question of which free exercise standard applied because policy at issue was valid under either approach).

5. *Employment Div., Dep't of Human Res. v. Smith,* 494 U.S. 872, 878–79, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

6. Facially neutral laws of general applicability can still offend the free exercise clause if they are clearly aimed at a particular religion, *Church of*

### b. The *Turner* test

The superior court held that Spring Creek's visitation rules limiting physical contact do not violate the federal free exercise clause because, following the test established by the United States Supreme Court in *Turner v. Safley*, it reasoned that the rules were "reasonably related to legitimate penological interests." [7] In *Turner* the Supreme Court reasoned that this deferential standard was required to prevent courts from becoming unduly involved in the "intractable problems" of prison administration.[8] The Court listed four factors that are relevant to determining whether a regulation is reasonable.[9] We hold that Spring Creek's visitation rules satisfy each factor.

■ The first factor requires "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." [10] Prison security is a compelling governmental interest,[11] and limitations on contact visits are rationally related to this interest.[12] Superintendent Armstrong stated in his affidavit that the types of contact Larson seeks are specifically prohibited, because they facilitate the smuggling of contraband. Larson does not contest this assertion, and we have been given

no basis for second-guessing the judgment of prison administrators on this score.[13]

Larson asserts that correctional officers are primarily responsible for introducing contraband into Spring Creek and correctional facilities generally. But this proposition, if true, is beside the point. Larson does not argue that contact visits do not *also* create a significant risk of contraband smuggling. Furthermore, Larson does not directly counter the defendants' argument that the types of contact Larson desires would exacerbate this problem. Thus, any dispute about whether correctional officers are responsible for more smuggling than visitors is not material to the issues properly before us.

The second *Turner* factor requires courts to examine "whether there are alternative means of exercising the right that remain open to prison inmates." [14] Larson argues that Spring Creek's contact limitations leave him no alternative means of practicing "Physical Religious Worship" with his wife. But the "alternative means" factor merely requires that adherents not be "deprived of *all* forms of religious exercise," not that they remain free to engage in the prohibited activity.[15] In this case, the contact limitations do not otherwise prevent Larson from fully practicing his religious beliefs.

the *Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), but Larson has not alleged that the disputed visitation rules were enacted with any discriminatory animus.

7. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (applying *Turner* test to prisoner free exercise claim).

8. *Turner*, 482 U.S. at 84–85, 89, 107 S.Ct. 2254 (explaining that courts are ill-equipped to deal with problems of prison administration, and that these problems have been committed to legislative and executive branches).

9. *Id.* at 89, 107 S.Ct. 2254.

10. *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)).

11. *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections

facilities themselves."); *see also Hines*, 148 F.3d at 358 (stating that institutional security is compelling interest); *May v. Baldwin*, 109 F.3d 557, 563 (9th Cir.1997) (same).

12. *Block*, 468 U.S. at 586, 104 S.Ct. 3227 ("That there is a valid, rational connection between a ban on contact visits and internal security of a detention facility is too obvious to warrant extended discussion.").

13. *See, e.g., O'Lone*, 482 U.S. at 353, 107 S.Ct. 2400 ("We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to 'substitute our judgment on ... difficult and sensitive matters of institutional administration ....' ") (quoting *Block*, 468 U.S. at 588, 104 S.Ct. 3227).

14. *Turner*, 482 U.S. at 90, 107 S.Ct. 2254.

15. *O'Lone*, 482 U.S. at 352, 107 S.Ct. 2400 (emphasis added) (observing that Muslims who were prevented from attending Jumu'ah by prison regulation remained free to "observe a number of their religious obligations").

The third *Turner* factor requires courts to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."[16] Cooper and Armstrong provide evidence of several likely impacts, principally increased security risks from expanded contact visits and the commensurate burden on prison resources created by the need to mitigate those risks through increased searches, monitoring, or both. Larson claims that his requested "religious visits" would not pose additional security risks and would not require additional security measures, but these arguments fail to create genuine issues of material fact for several reasons.

We note preliminarily that Larson did not offer any admissible evidence regarding his religious practices to counter the affidavits Cooper and Armstrong offered in support of their motion for summary judgment. Rather, his opposition to their motion and affidavits relied exclusively on his own unsworn contentions. Ordinarily this would be cause for affirmance, because non-movants may not rely upon assertions of fact in unverified pleadings and memoranda to oppose a motion for summary judgment.[17] But we have held that "the pleadings of *pro se* litigants should be held to less stringent standards than those of lawyers," and have held that pro se litigants should be informed of the need to submit affidavits or other evidence to preclude summary judgment.[18] The superior court's ruling did not rely on Larson's failure to produce admissible evidence, and instead appeared to treat Larson's pleadings as counter-affidavits. We will do the same in this appeal.

Larson asserts that his wife would voluntarily submit to a strip-search before visiting him, that he is always strip-searched following contact visits, and that he could be placed in a "dry cell" to further ensure that he had not received contraband. But the governing regulations and constitutional law do not permit strip-searches of visitors unless there are reasonable grounds to suspect that the visitor possesses contraband.[19]

Larson emphasizes that his wife would voluntarily submit to such searches. Larson cannot waive his wife's Fourth Amendment rights to be free from unreasonable searches. But even if she unconditionally agreed to submit to pre-visit strip-searches, we are not convinced that her submission would require prison officials to grant Larson's request for extended contact visitation privileges. Suspicionless searches of visitors and prisoners[20] would impose additional burdens on prison staff. Superintendent Armstrong's affidavit established that the prison staff is already short-handed. Intrusive searches are normally not cross-gender, and searches of female visitors would be disruptive, considering that only twelve of the 127 correctional officers are female. Likewise, using a dry cell to prevent the introduction of ingested contraband is even more resource-intensive, because the inmate must be placed under observation in the designated cell until the inmate excretes any ingested contraband. Finally, the impacts resulting from Larson's own visitation requests cannot be considered in isolation. Based on the statements in Superintendent Armstrong's affidavit, we assume that a significant number of other Spring Creek prisoners would ask for similar privileges.[21] Accordingly, the superior court

**16.** *Turner,* 482 U.S. at 90, 107 S.Ct. 2254.

**17.** *Brock v. Rogers & Babler, Inc.,* 536 P.2d 778, 783 (Alaska 1975).

**18.** *Breck v. Ulmer,* 745 P.2d 66, 75 (Alaska 1987) (original emphasis).

**19.** 22 Alaska Administrative Code (AAC) 05.130(b) (1991) ("In order to have contact visitation with a prisoner, a visitor may be required to submit to a strip search, if reasonable grounds exist to believe that the visitor is in possession of contraband."); *see also Leverette v. Bell,* 247 F.3d 160, 167 (4th Cir.2001) (collecting cases holding that invasive search of visitor must be supported

by reasonable suspicion that visitor is carrying contraband).

**20.** *Bell v. Wolfish,* 441 U.S. 520, 558–60, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (stating that suspicionless body cavity search of all inmates at detention facility following every contact visit is not unreasonable).

**21.** *Cf. Turner,* 482 U.S. at 90, 107 S.Ct. 2254 ("When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.").

did not err in analyzing the third factor when it held that "the impact of allowing for an exception is unduly burdensome to the prison."

The final *Turner* factor requires courts to consider whether there are any "ready alternatives" to the policy in dispute.[22] The Supreme Court made it clear, however, that "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."[23] The Court further suggested that only those alternatives that would accommodate the prisoner's rights at "*de minimis* cost to valid penological interests" could be considered relevant to a court's inquiry into whether a regulation is reasonable.[24] Larson's proposed alternative of intensified searches imposes more than de minimis costs. The only other alternative that might accommodate Larson's claim would be increased monitoring, which is also a resource-intensive undertaking. Either way, Spring Creek would have to invest more resources in security or simply accept the risk of increased contraband smuggling that Larson's claimed exemption would entail. There is no "obvious, easy alternative" to Spring Creek's visitation rules.[25]

### 2. The superior court did not err in holding that Spring Creek's visitation rules do not violate the Alaska Constitution's free exercise clause.

■ The superior court held that Spring Creek's visitation rules do not violate the Alaska Constitution's free exercise clause.[26] *Frank v. State* established a two-part test governing claims brought under this clause challenging facially neutral laws.[27] Under the first part of the test, the challenger must satisfy three requirements: a religion is involved, the conduct in question is religiously based, and the claimant is sincere in his or her religious belief.[28] Under the second part of the test, courts must consider whether the conduct poses "some substantial threat to public safety, peace or order,"[29] or whether "there are competing governmental interests that are 'of the highest order and . . . (are) not otherwise served.' "[30]

The superior court assumed that Larson satisfied the first part of the test, and Cooper and Armstrong do not ask us to re-visit this assumption. The superior court addressed the second part of the *Frank* test by holding that Spring Creek's visitation rules were narrowly tailored to serve the "compelling state interest in secure prisons free from contraband." The court further held that granting Larson's religious exemption by adopting the alternative security measures he proposed would be "unduly burdensome."

### a. How to apply *Frank's* second part

■ Before they discuss Larson's claims under the free exercise clause of the Alaska Constitution, Cooper and Armstrong address at length the standard governing such claims. They ultimately ask us to adopt a "compelling interest/narrow tailoring" standard most commonly found in First Amendment jurisprudence governing time, place, and manner restrictions and commercial speech restrictions, rather than the "compelling interest/least restrictive means" standard applied in federal free exercise cases predating *Employment Division, Department of Human Resources v. Smith.*[31] Defendants argue

22. *Id.*

23. *Id.* at 90–91, 107 S.Ct. 2254.

24. *Id.* at 91, 107 S.Ct. 2254.

25. *Id.* at 90, 107 S.Ct. 2254.

26. Alaska Const. art. 1, § 4.

27. *Frank v. State,* 604 P.2d 1068, 1070–73 (Alaska 1979).

28. *Id.* at 1071–73; *see also Swanner v. Anchorage Equal Rights Comm'n,* 874 P.2d 274, 281 (Alaska 1994).

29. *Frank,* 604 P.2d at 1070 (quoting *Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

30. *Id.* (quoting *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)).

31. *See Employment Div., Dep't Human Res. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). We chose not to follow

that we have never clearly articulated the second part of the standard we adopted in *Frank*. *Frank* made it clear that only compelling state interests could justify burdens on the exercise of religion.[32] *Frank* and our subsequent Alaska free exercise cases have not explained exactly what degree of fit is required between the interest and the means used to achieve it to satisfy the second part of the *Frank* analysis.

Nonetheless, this case does not require the elaboration defendants seek. *Frank* explained that the appropriate question, after a court determines that the claimed exemption implicates a compelling government interest, is "whether that interest, or any other, will suffer if an exemption is granted to accommodate the religious practice in issue."[33] This test adequately addresses the closeness of the fit between the state's interest and the means used to achieve it. If an exemption would not harm the government's interest, the means chosen to achieve the interest were probably neither narrowly tailored nor least restrictive. For purposes of this case, *Frank* and its Alaska progeny adequately state the dispositive standard.

Moreover, it is not obvious why *Frank's* analysis must coincide with either of the two formulations discussed in the defendants' brief. The concepts of "narrow tailoring" and "least restrictive means" no longer apply to prisoners' federal constitutional claims or federal free exercise claims generally.[34] We therefore see no reason to determine which of these formulations best characterizes the *Frank* test in the context of prisoner free exercise claims brought under Alaska's free exercise clause.

Finally, in the context of prisoner free exercise claims we think it appropriate to temper our application of the *Frank* test in recognition of the Supreme Court's observation that "[r]unning a prison is an inordinately difficult undertaking,"[35] and its statement that " 'prison administrators . . ., and not the courts, [are] to make the difficult judgments concerning institutional operations.' "[36] This statement indicates that the federal courts apply a highly deferential standard in reviewing the decisions of prison administrators. Larson's case does not require us to consider whether Alaska courts should apply an equally deferential standard. Rather, we simply acknowledge, as we did in *Mathis v. Sauser*, that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict-scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration."[37]

### b. Applying the second part of the *Frank* test here

The defendants' appellate brief does not directly discuss how the second part of the *Frank* test applies here.[38] But their analysis of the third and fourth *Turner* factors—impact of accommodation and availability of ready alternatives—convincingly addresses the values that underlie the second part of the *Frank* test.

Superintendent Armstrong's affidavit provides evidence that the contact visitation accommodations Larson seeks (and that other prisoners would also then predictably claim) would require significant resource outlays to

---

*Smith* in *Swanner*, 874 P.2d at 280–81, and instead chose to evaluate free exercise claims brought under the Alaska Constitution using the test established in *Frank*.

**32.** *Frank*, 604 P.2d at 1073.

**33.** *Id.*

**34.** *See supra* Part III.A.1 (discussing *Turner* and *Smith* standards).

**35.** *Turner v. Safley*, 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *see also Overton v. Bazzetta*, 539 U.S. 126, 123 S.Ct. 2162, 2167, 156 L.Ed.2d 162 (2003) (according "substantial def-

erence to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them").

**36.** *Turner*, 482 U.S. at 89, 107 S.Ct. 2254 (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)).

**37.** *Mathis v. Sauser*, 942 P.2d 1117, 1121 n. 7 (Alaska 1997) (quoting *Turner*, 482 U.S. at 89, 107 S.Ct. 2254).

**38.** 604 P.2d at 1073–74.

mitigate against the resulting increased risk of contraband smuggling. These outlays would result from increased searches, monitoring, or both.[39] Armstrong's affidavit states that budgetary constraints would prevent Spring Creek from implementing the security measures Larson proposes without jeopardizing other areas of Spring Creek.

Larson's claim that an accommodation would be virtually without cost does not create genuine issues of material fact precluding summary judgment for the defendants.[40] The record in this case establishes beyond dispute that Larson's recommendation that he and his wife be strip-searched, or that he be placed in a dry cell in connection with each "religious visit," would be resource-intensive; the cost would be multiplied by the accommodations needed to satisfy other prisoners who would inevitably claim similar privileges.[41] Likewise, we are unpersuaded by Larson's claim that, because the "religious visits" would take place in a room currently designated for attorney-client visits, increased monitoring would not be necessary. Larson asserts that the room has large one-way observation mirrors that permit officers "in or around" the shift supervisor's office across the hallway to monitor visits while going about their other tasks; no additional prison resources would have to be dedicated to the monitoring effort. As a matter of law, this proposed accommodation raises no genuine factual dispute. Monitoring contact visits is an important security function that cannot be informally satisfied by random observations by officers who happen to be going past the observation mirrors.[42]

Spring Creek placed additional limits on contact visits in 1999, but did not prohibit them entirely. The defendants argue that the new rules are a proportionate response to the risks posed by contact visits: the new rules limit the opportunities to smuggle contraband while affording some opportunity to engage in the natural desire to be physically affectionate with friends and loved ones. Courts are generally ill-positioned to second-guess prison administrators' judgment that hand-holding between visitors and maximum security prisoners would jeopardize the state's compelling interest in security. In any event, we conclude that Larson has not demonstrated that any genuine, material factual disputes precluded summary judgment for defendants on Larson's state free exercise claim.

### 3. Spring Creek's visitation rules do not infringe on Larson's right to rehabilitation.

█ Larson argues that his right to rehabilitation, guaranteed by article 1, section 12 of the Alaska Constitution, includes the right to "religious visits" described above, because such visits promote rehabilitation "as nothing else can." Cooper and Armstrong argue that this cannot be correct because nothing in the text of article 1, section 12 or the constitutional convention minutes supports a right to have the extended contact visitation Larson seeks.[43]

We recognized in *Brandon v. State, Department of Corrections* that "visitation privileges are a component of the constitutional right to rehabilitation" guaranteed by article 1, section 12 of the Alaska Constitution.[44] But we have been referred to nothing in article 1, section 12 or the constitutional minutes that implies any intention to constitutionalize extended contact visits for maximum security prisoners or to preclude prisons from putting reasonable limits on contact visitation of maximum security prisoners. Some physical contact may well promote rehabilitation, but that would not alone

---

**39.** See the discussion above in Part III.A.1.b.

**40.** *See id.* (discussing increased monitoring and search costs associated with granting Larson's requested accommodation in context of *Turner's* third factor).

**41.** *See id.*

**42.** Larson contends that Spring Creek has never had to increase staff to monitor the attorney-client visitation room in the past. But past staff-

ing needs are based on past visitation rules; they are irrelevant to the expanded visitation Larson seeks and others would then demand.

**43.** The superior court did not reach this issue although it was briefed below by both parties.

**44.** *Brandon v. State, Dep't of Corrs.*, 938 P.2d 1029, 1032 n. 2 (Alaska 1997).

justify a conclusion in this case that Larson had an unqualified constitutional right to extended contact visitation with his wife. The security risks posed by contact visits and the high costs of mitigating such risks convince us that the degree of contact permitted between visitors and maximum security prisoners lies within the sound discretion of prison administrators.

### 4. The superior court did not err in failing to grant Larson conjugal visits.

Larson also contends on appeal that he has a constitutionally protected religious right to conjugal visits with his wife. But in the superior court he expressly stated that he was not making that contention. He therefore waived any claim that he has a constitutional right to conjugal visits. He cannot make such a claim for the first time in this appeal.[45]

### B. Larson's Claims in S–10431

Larson argues in S–10431 that the superior court erroneously granted summary judgment to Superintendent Cooper and Officer Davis. In arguing error, he advances seven contentions: (1) Davis's order to Larson that he release his wife's hand was "illegal" and violated Larson's constitutional right to free exercise of religion; (2) Davis had no legitimate reason to demand that Larson release his wife's hand; (3) Larson has a liberty interest, apparently originating in the First Amendment, in having contact visitation with his wife; (4) Larson has a state-created liberty interest, originating in Alaska Constitution article I, section 12, in contact visitation; (5) DOC violated Larson's due process rights by failing to give him fair notice that hand-holding was not permissible; (6) Davis's order to Larson violated the prison standard operating procedure, thereby violating Larson's constitutional right to free exercise of religion and due process; and (7) Larson was entitled to an administrative hearing concerning his right to contact visitation.

Larson provides no meaningful substantive discussion of these theories.

Larson's first contention, that Davis and Cooper violated his right to free exercise of religion, is resolved by our discussion of his appeal in S–10327. Because the rules Davis and Cooper enforced did not themselves violate the right to free exercise of religion, enforcing those rules did not violate the free exercise clauses, either.[46]

 The rest of Larson's contentions in S–10431 turn on whether under the circumstances of this dispute he has a protectable federal or state liberty interest in contact visitation. We conclude that he does not.

The United States Supreme Court has explained that under the federal constitution's Fourteenth Amendment, " '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.' "[47] The Court has explained that the guarantee of due process does not provide a right to parole,[48] freedom from transfer to higher-security facilities,[49] or a right to avoid segregation from the general prison population.[50]

We conclude that if the federal due process clause does not guarantee these benefits, it

---

**45.** *Pasco v. State, Dep't of Admin.,* 45 P.3d 325, 328–29 (Alaska 2002) (holding that this court will not consider arguments raised for first time on appeal).

**46.** We consider in S–10708 the separate issue whether prison officials had an improper retaliatory motive for continuing to deny contact visitation to Larson for about two months after the prison disciplinary committee found him not guilty of disobeying a direct order.

**47.** *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460–61, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (quoting *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976)).

**48.** *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

**49.** *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

**50.** *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

necessarily must not provide a lesser right to contact visitation.

We next consider whether Alaska law has created a liberty interest that is protected by the federal constitution's Fourteenth Amendment. The United States Supreme Court explained in *Sandin v. Conner* that in the prison context, state-created liberty interests protected by the Fourteenth Amendment "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."[51] In *Sandin*, the Court ruled that "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."[52] The Court reasoned that placing a prisoner in solitary confinement for thirty days "did not work a major disruption in his environment."[53]

Larson was denied contact visitation for seventy-three days but was allowed secure visitation throughout that period. Whether or not the temporary suspension of all visitation might implicate a liberty interest, we agree with the defendants that temporarily suspending contact visitation, while continuing to allow secure visitation, is not so atypical and significant a hardship beyond ordinary prison life that it implicates a protected liberty interest.[54]

Finally, we consider Larson's contention that the Alaska Constitution creates a protectable liberty interest in contact visita-

tion. Larson argues that defendants Cooper and Davis deprived him of a liberty interest he claims was established by the reformation clause of article I, section 12 of the Alaska Constitution. That clause states in part, "[c]riminal administration shall be based upon the following: the need for protecting the public, community condemnation of the offender, the rights of victims of crimes, restitution from the offender, and the principle of reformation."

In *Brandon v. State, Department of Corrections* we considered article I, section 12 of the Alaska Constitution in the context of the transfer of a prisoner out of state, potentially preventing the prisoner's relatives from visiting him.[55] We recognized that visitation was "a component of the constitutional right to rehabilitation."[56] But we declined to define the scope of visitation privileges protected by the constitution and any limits on the exercise of those privileges; instead, we explained that "[s]uch definitions will have to be achieved in future adjudications."[57] Today we hold that a temporary suspension of contact visitation is a permissible limitation on visitation.

In *Matson v. Commercial Fisheries Entry Commission,* we explained that "[f]or the due process clause to apply, there must be 'the deprivation of an individual interest of sufficient importance to warrant constitutional protection.' "[58] Although visitation implicates the constitutional right to reformation, Cooper and Davis did not deprive Larson of visitation. They temporarily deprived Larson of contact visitation as a form of prison discipline. As the United States Supreme Court noted in *Overton v. Bazzetta,* many states "us[e] withdrawal of visitation privi-

**51.** *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (citation omitted).

**52.** *Id.* at 486, 115 S.Ct. 2293.

**53.** *Id.*

**54.** *Cf. Ware v. Morrison,* 276 F.3d 385, 387 (8th Cir.2002) (holding prisoner's "loss of visitation privileges is within the ordinary incidents of confinement and cannot be considered an atypical and significant hardship"); *Blair v. Loomis,* 1 F.Supp.2d 769, 772–73 (N.D.Ohio 1998); *Drayton v. Comm'r of Corr.,* 52 Mass.App.Ct. 135, 751 N.E.2d 916, 919–20 (2001) (loss of visitation

privileges for one year did not implicate liberty interests protected by Fourteenth Amendment).

**55.** *Brandon v. State, Dep't of Corrs.,* 938 P.2d 1029, 1030–32 (Alaska 1997).

**56.** *Id.* at 1032 n. 2.

**57.** *Id.*

**58.** *Matson v. Commercial Fisheries Entry Comm'n,* 785 P.2d 1200, 1206 (Alaska 1990) (quoting *Nichols v. Eckert,* 504 P.2d 1359, 1362 (Alaska 1973)).

leges for a limited period as a regular means of effecting prison discipline. This is not a dramatic departure from accepted standards for conditions of confinement."[59] But as the Court recognized, "[i]f the withdrawal of all visitation privileges were permanent or for a much longer period, or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations."[60] In this case, the temporary interference with Larson's contact visitation privileges as a means of effecting prison discipline was not so severe that it implicated a constitutionally protected liberty interest.

## IV. CONCLUSION

For these reasons, we AFFIRM the superior court's grants of summary judgment.[61]

---

**59.** *Overton v. Bazzetta,* 539 U.S. 126, 123 S.Ct. 2162, 2170, 156 L.Ed.2d 162 (2003).

**60.** *Id.*

**61.** Our conclusion that Cooper and Davis did not deprive Larson of a protectable liberty interest in contact visitation necessarily disposes of his contention that it was a denial of his procedural due process rights not to give him a hearing on his alleged right to have contact visitation. He was given a hearing after he was charged with disobeying a direct order. This hearing gave him an opportunity to dispute the adequacy of notice.