*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| KEILAN EBLI, | ) |
| | ) Supreme Court No. S-16916 |
| Appellant, | ) |
| | ) Superior Court No. 3PA-16-01708 CI |
| v. | ) |
| | ) O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF CORRECTIONS, | ) |
| | ) No. 7418 – November 1, 2019 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: Keilan Ebli, pro se, Wasilla, Appellant. Mary B. Pinkel, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Stowers, Maassen, and Carney, Justices. [Winfree, Justice, not participating.]

MAASSEN, Justice.

## I. INTRODUCTION

When the Department of Corrections (DOC) discovered that one of its contract employees, a substance abuse counselor, was in an "intimate relationship" with a prisoner in violation of prison policy, DOC barred the counselor and her parents from visiting the prisoner or putting money in his prison bank account. The prisoner sued

DOC, alleging that these restrictions violated his constitutional and statutory rights to rehabilitation.

When the prisoner moved for summary judgment, DOC moved to amend its answer to deny the statutory claim it had failed to deny in its original answer. The prisoner then moved to amend his complaint to add a claim asserting the constitutional rights of the counselor and her parents. The superior court granted DOC's motion to amend, denied the prisoner's motion to amend as futile, and granted summary judgment in DOC's favor. The prisoner appeals.

We conclude that DOC's visitation restrictions are reasonable exercises of its authority to address legitimate penological interests and therefore do not violate the prisoner's constitutional or statutory rights to rehabilitation. We also conclude that the superior court did not abuse its discretion when it granted DOC's motion to amend its answer and denied the prisoner's motion to amend his complaint. For these reasons we affirm the judgment of the superior court.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Keilan Ebli is a prisoner at Goose Creek Correctional Center (Goose Creek). There he met Kerri Pittman, a substance abuse counselor employed by a private company but working as a DOC contract employee. Ebli and Pittman developed what DOC later concluded was an "intimate relationship." Ebli characterizes the relationship as a "non-sexual" "friendship," but DOC submitted affidavits on summary judgment that painted a different picture. A DOC employee attested to finding photo albums in Ebli's cell that included photos of Ebli and Pittman kissing and "displaying wedding rings within a secure area of the facility." Through phone-call monitoring, DOC determined that there were over two thousand calls between Pittman and Ebli between September 2015 and May 2017, that Pittman regularly called using an alias, and that

some of the calls involved phone sex. In one call Ebli and Pittman discussed being "married now," though Ebli had never sought the permission of Goose Creek administrators to get married, as required by prison rules.

Pittman transferred to Palmer Correctional Center, but her relationship with Ebli continued. Pittman and her parents, Vallie and Darold Arthur, continued to visit Ebli regularly at Goose Creek, and the Arthurs deposited money in his prison bank account. Ebli began to view Darold Arthur as a "father figure" and "role model."

DOC learned about Pittman's relationship with Ebli in late February or early March 2016. At some point — unclear from our record — Pittman's employment was terminated on grounds of "staff misconduct." On March 15, 2016, the Goose Creek superintendent notified her in writing that she was indefinitely barred from visiting any prisoner incarcerated in any DOC facility. Similar notices were sent to the Arthurs, informing them that they were indefinitely barred from visiting or putting money in the account of any prisoner incarcerated at Goose Creek. Copies of the notices were sent to Ebli; the notice to Pittman stated that "[t]he affected prisoner may grieve this matter to the Director of Intuitions [sic] through the grievance process." Ebli accordingly followed the grievance process through appeal, but without success. DOC denied his request in October 2016 to temporarily lift the restrictions for a final visit with Darold Arthur, who died of cancer a few months later.

One DOC witness, identifying herself as a probation officer with professional training in the ethical considerations of counseling professionals, attested that all DOC "employees and private contractors are told during orientation at Goose Creek that they are not allowed to develop friendships with prison inmates." They are also "required to sign a Code of Ethical [Professional] Conduct," which states, among other things, "that they are prohibited from engaging in undue familiarities with inmates." One explicit DOC ethics rule provides: "I will not act in my official capacity

in any matter in which I have a personal interest that could in the least degree impair my objectivity. I will not engage in undue familiarity with inmates, probationers, or parolees." DOC's witness attested that these rules are especially important for counseling professionals, whose friendships or intimate relationships can easily affect objectivity and lead a counselor to "act in ways that are not in the client's best interests." The witness opined that Pittman's relationship with Ebli, including the involvement of Pittman's parents, violated the ethics code.

## B. Proceedings

Ebli sued DOC in July 2016, claiming that its restrictions on visitation violated his constitutional right to rehabilitation under article I, section 12 of the Alaska Constitution and breached a statutory duty under AS 33.30.011(a)(3)(F), thereby constituting negligence per se.[1] Ebli moved for summary judgment, relying in part on DOC's failure to include in its answer a denial of his negligence per se claim. DOC moved to amend its answer to add the missing denial, and the court allowed the amendment.

DOC also cross-moved for summary judgment. Ebli moved to amend his complaint to add a claim that DOC's actions had violated Pittman's and the Arthurs' constitutional rights as well as his own, but the court denied his motion, seeing no "cognizable claim" in the proposed amendment. The court then denied Ebli's motion for summary judgment and granted DOC's cross-motion. The court concluded that DOC's visitation restrictions did not violate Ebli's constitutional rights, relying on the

---

[1] AS 33.30.011(a)(3)(F) identifies the responsibilities of the DOC commissioner toward prisoners in DOC custody, including to "otherwise provide for the rehabilitation and reformation of prisoners, facilitating their reintegration into society."

deferential test of *Turner v. Safley*.[2]  The court also found that there was no evidence to support Ebli's negligence per se claim.  Ebli appeals.

## III.  STANDARD OF REVIEW

"We review a grant of summary judgment 'de novo, affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law.' "[3]  We review de novo questions of law, including constitutional questions and the interpretation of procedural rules.[4]  In de novo review we apply our independent judgment and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[5]

We review decisions on motions to amend pleadings for abuse of discretion, "and we will interfere only when that discretion has been abused."[6]  "We will reverse a ruling for abuse of discretion only when left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling."[7]  "It is within a trial court's discretion to deny such a motion where amendment would be

---

[2]    48 U.S. 78, 87 (1987).

[3]    *Olson v. City of Hooper Bay*, 251 P.3d 1024, 1030 (Alaska 2011) (quoting *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008)).

[4]    *DeNardo v. ABC Inc. RVs Motorhomes*, 51 P.3d 919, 922 (Alaska 2002).

[5]    *Fraternal Order of Eagles v. City & Borough of Juneau*, 254 P.3d 348, 352 (Alaska 2011) (quoting *Alaskans for Efficient Gov't, Inc. v. State*, 153 P.3d 296, 298 (Alaska 2007)).

[6]    *Betz v. Chena Hot Springs Grp.*, 742 P.2d 1346, 1348 (Alaska 1987).

[7]    *Ruckle v. Anchorage Sch. Dist.*, 85 P.3d 1030, 1034 (Alaska 2004) (quoting *DeSalvo v. Bryant*, 42 P.3d 525, 527-28 (Alaska 2002)).

futile because it 'advances a claim or defense that is legally insufficient on its face.' "[8] "We use our independent judgment to review a conclusion that an amendment meets that description."[9]

## IV. DISCUSSION

### A. The Visitation Restrictions Do Not Violate Ebli's Constitutional Right To Rehabilitation.[10]

Article I, section 12 of the Alaska Constitution provides in part: "Criminal administration shall be based upon the following: the need for protecting the public, community condemnation of the offender, the rights of victims of crimes, restitution from the offender, and the principle of reformation." In *Brandon v. State, Department of Corrections*, we cited this provision as the source of "a fundamental right to rehabilitation," and we recognized visitation privileges as one component of that right.[11] The superior court in this case expressly acknowledged the extent of the constitutional right, but it decided that DOC's restrictions on visitation by Pittman and the Arthurs withstood Ebli's constitutional challenge. The court looked to the "deferential standard" established by the United States Supreme Court in *Turner v. Safley*,[12] which we applied

---

[8]     *Krause v. Matanuska-Susitna Borough*, 229 P.3d 168, 174 (Alaska 2010) (quoting *Hallam v. Alaska Airlines, Inc.*, 91 P.3d 279, 287 (Alaska 2004)).

[9]     *Id.* at 174-75.

[10]     Ebli does not brief the merits of his statutory negligence per se claim on appeal, arguing only that the superior court erred by allowing DOC to deny the claim in its amended answer. We address this procedural argument in section IV.C., below.

[11]     938 P.2d 1029, 1032 & n.2 (Alaska 1997).

[12]     482 U.S. 78, 84-85 (1987).

to visitation privileges in *Larson v. Cooper*.[13]

The *Turner* standard "allows prison administration to establish rules [that] are 'reasonably related to legitimate penological interests.' "[14]  The Supreme Court in *Turner* identified "four factors that are relevant to determining whether a [prison] regulation is reasonable":  (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) " 'whether there are alternative means of exercising the right that remain open to prison inmates' "; (3) " 'the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally' "; and (4) "whether there are any 'ready alternatives' to the policy in dispute."[15]

While recognizing the importance of visitation privileges in *Brandon*, we left the definition of "their required scope or the permissible limits on their exercise" to "future adjudications."[16]  One such case was *Larson*, in which an inmate challenged DOC restrictions on contact between prisoners and visitors.[17]  The prison had changed

---

[13]     90 P.3d 125, 129-31 (Alaska 2004); *see also Mathis v. Sauser*, 942 P.2d 1117, 1121 & n.7 (Alaska 1997) (citing *Turner* for the proposition that "[w]here the purpose of the [prison] regulation is permissible and there is a reasonable relationship between the policy goal and the ends chosen to achieve it, courts will generally defer to the judgment of prison officials").  We more recently applied the *Turner* test in *Leahy v. Conant*, 436 P.3d 1039, 1045-46 (Alaska 2019), addressing restrictions on prisoner mail.

[14]     482 U.S. at 89; *Larson*, 90 P.3d at 129.

[15]     *Larson*, 90 P.3d at 129-31 (quoting *Turner*, 482 U.S. at 89-90).

[16]     938 P.2d at 1032 n.2.

[17]     90 P.3d at 126.

"the rules governing contact visitations to prohibit all physical contact between prisoners and visitors other than 'a short embrace upon initial contact and again upon departure.' "[18] When Larson broke this rule by holding his wife's hand during prayer, DOC suspended his contact visitation privileges and restricted him to "secure visitation" only.[19] Our opinion focused primarily on Larson's claim under the Alaska Constitution's free exercise of religion clause;[20] we applied the *Turner* test and our own *Frank* test for free exercise claims[21] to conclude that the prison officials' decision was entitled to deference.[22] But Larson also argued that he had a rehabilitation-related right to "religious visits" under article I, section 12, "because such visits promote rehabilitation 'as nothing else can.' "[23] We held that nothing in this constitutional provision requires such visits or "preclude[s] prisons from putting reasonable limits on contact visitation of maximum security prisoners."[24] We concluded that "[t]he security risks posed by contact visits and the high costs of mitigating such risks convince us that the degree of contact permitted betweeen visitors and maximum security prisoners lies within the

---

[18] *Id.*

[19] *Id.* at 127.

[20] Alaska Const. art. 1, § 4.

[21] *Frank v. State*, 604 P.2d 1068, 1070-73 (Alaska 1979) (establishing multi-factor test for determining whether facially neutral laws violate Alaska Constitution's free exercise clause).

[22] *Larson*, 90 P.3d at 129-33.

[23] *Id.* at 133.

[24] *Id.*

sound discretion of prison administrators."[25]

Ebli argues that the justifications DOC offers for the visitation restrictions in his case — security and rehabilitation concerns — are "frivolous." DOC provided considerable support for its position that there are legitimate concerns for prison "safety, security, inmate rehabilitation, and institutional morale" that justified its decision. It is undeniable that prison security is a legitimate penological interest.[26] Several DOC employees attested there was a security risk to continued visitation between Ebli and Pittman because of the knowledge of confidential internal prison matters she had acquired during her employment. Pittman's relationship with Ebli and resulting loss of objectivity increased the possibility that she would share this information with Ebli. Her willingness to violate DOC ethics policy and to use an alias when calling showed "that she cannot be trusted" and further exacerbated the risk. A DOC witness also attested to a concern that the rehabilitation of Ebli and other inmates, as well as staff morale, would suffer if Ebli and Pittman were "allowed to break prison rules without consequences." And DOC may reasonably have the same concerns about Ebli's relationship with the Arthurs, given that it derived from the unethical and surreptitious relationship with Pittman.

Questioning the legitimacy of these rationales, Ebli argues that Pittman "was a non-security support staff member" who "had no access to confidential DOC facility information"; that any information she might have about "movement schedules,

---

[25]     *Id.* at 134.

[26]     *Id.* at 129 ("Prison security is a compelling governmental interest."); *see Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("[P]romot[ing] internal security [is] perhaps the most legitimate of penological goals."); *see also Leahy v. Conant*, 436 P.3d 1039, 1046 (Alaska 2019) (concluding that DOC had "a legitimate penological interest" in addressing prisoners' use of prison mail system to facilitate assaults, conduct illegal business and drug activities, and communicate within gangs).

shift changes, and recreation schedules" is posted and already known to prisoners; that allowing Ebli and Pittman to talk on the phone moots DOC's concerns about security threats, as "any information that could be conveyed by Ms. Pittman to Ebli during a contact visit can also be conveyed to him during a telephone conversation"; that "DOC's concerns of blackmail were mooted by [its] termination of Ms. Pittman," after which her employment status could no longer be used as leverage; that DOC ethics policies did not apply to the Arthurs; and that DOC's purported concerns about rehabilitation are vague and overstated.

It is not necessary for us to know the extent of Pittman's knowledge of DOC procedures, how much of what she knew was actually confidential, and whether she could or did share confidential knowledge with Ebli before we can determine the legitimacy of the penological interest at issue here. It is reasonable for DOC to promulgate and enforce rules governing the relationships between prisoners and professional staff and to be concerned that a lack of enforcement will encourage more breaches of the rules. We defer to DOC's determination of what is and is not a security concern, and we disagree with Ebli's assertion that DOC's stated concerns are frivolous.

The next question is whether the visitation restrictions are reasonably related to DOC's legitimate interests. Like the restriction in *Larson*, the visitation restrictions on Ebli do not appear to be "a dramatic departure from accepted standards for conditions of confinement."[27] Restricting visitation between a prisoner and a non-prisoner who has violated prison policy, especially a former staff member involved in an ethically inappropriate relationship with the prisoner, could be considered normal

---

[27] *Larson*, 90 P.3d at 136 (quoting *Overton*, 539 U.S. at 137).

prison policy.[28] The Supreme Court has explicitly recognized that "[t]he denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence.' "[29] And importantly for purposes of the second *Turner* factor, DOC did not withdraw all of Ebli's visitation privileges; he had "alternative means of exercising the right."[30] Physical visits were restricted only for Pittman and her parents, and Ebli's telephone privileges were not affected.

Analysis of the third *Turner* factor — "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" — is partly subsumed in our discussion of the first factor, where we noted the evidence that failure to restrict Ebli's visitation privileges under these circumstances could negatively affect morale and respect for rules on the part of

---

[28]    *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 457 n.2 (1989) (examining prison policy requiring former prison employee to have prior authorization from warden before visiting inmate); *Riker v. Lemmon*, 798 F.3d 546, 549 (7th Cir. 2015) (examining prison policy by which "former employees must make a written request to visit an offender [and] . . . generally 'shall not be allowed to visit an offender who has been housed in the same facility in which the ex-employee was employed and who was incarcerated at the facility during the time the ex-employee was employed there' "); *Engle v. Tenn. Dep't of Corr.*, 63 F. App'x 860, 863 (6th Cir. 2003) (holding that visitation and communication restrictions on former prison employee attempting to assist incarcerated friends with legal matters were not unconstitutional because they were "rationally related to a legitimate penological objective"); *Mayo v. Lane*, 867 F.2d 374, 386 (7th Cir. 1989) (examining prison policy requiring that "[i]n order to preserve the security of the facility . . . [e]mployees or former employees who have been involved with an inmate(s) may be permanently restricted from institutional visits").

[29]    *Ky. Dep't of Corr.*, 490 U.S. at 461 (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)).

[30]    *Larson*, 90 P.3d at 129 (quoting *Turner v. Safley*, 482 U.S. 78, 90 (1987).

both prisoners and staff.[31]  A DOC security sergeant, by affidavit, addressed Ebli's argument that Goose Creek could "accommodate [him] by allowing 'secure visits.' " While not discussing the logistics of such visits, the sergeant attested that allowing them "would undermine prison goals of rehabilitation, security, safety and morale."  It is reasonable to conclude that accommodating Ebli and Pittman's relationship by devoting more prison resources to the monitoring of "secure visits" would undercut DOC's legitimate concerns.

As for the final *Turner* factor — "whether there are any 'ready alternatives' to the policy in dispute"[32] — the Supreme Court has "suggested that only those alternatives that would accommodate the prisoner's rights at '*de minimis* cost to valid penological interests' could be considered relevant."[33]  And it is not DOC's burden "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."[34]  Ebli has proposed only "secure visits" as a "ready alternative," and, as explained above, we defer to DOC's judgment that this alternative would have more than a "*de minimis* cost to valid penological interests."

In sum, the restrictions on Ebli's visitation with Pittman and the Arthurs did not violate Ebli's right to rehabilitation under article I, section 12 of the Alaska Constitution.  Given the legitimate penological interest in prison security involved and

---

[31]     *Id.* at 130 (quoting *Turner*, 482 U.S. at 90).

[32]     *Id.* at 131 (quoting *Turner*, 482 U.S. at 90).

[33]     *Id.* (quoting *Turner*, 482 U.S. at 91).

[34]     *Id.* (quoting *Turner*, 482 U.S. at 90-91).

the reasonable relationship between the restriction and this interest, the superior court properly deferred to the judgment of the prison administrators that these restrictions were appropriate.

### B. The Superior Court Did Not Abuse Its Discretion By Granting DOC's Motion To Amend Its Answer.

Ebli argues that the superior court abused its discretion when it allowed DOC to amend its answer to deny the negligence per se claim, a denial it originally omitted. Alaska Civil Rule 8(d) provides that "[a]verments in a pleading to which a responsive pleading is required . . . are admitted when not denied in the responsive pleading." Ebli relies on this rule to argue that DOC, having tacitly admitted liability, cannot use Alaska Civil Rule 15(a)'s amendment process "to render null the fair but harsh effects of Civil Rule 8(d)'s automatic admission provision."

Except for the limited circumstances in which a party is allowed to amend a pleading as a matter of course under Civil Rule 15(a), "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." It is well established that leave to amend should be "liberally granted."[35] "[W]e have long held that leave should freely be given unless 'it would [result] in an injustice' [and that a] 'pro-amendment ethos dominates the intent and judicial construction of Rule 15(a).' "[36] This is especially true when amendment will allow the claim to be tested on its merits.[37]

---

[35] *Miller v. Safeway, Inc.*, 102 P.3d 282, 293 (Alaska 2004).

[36] *Id.* at 293-94 (internal citations omitted).

[37] *Lingley v. Alaska Airlines, Inc.*, 373 P.3d 506, 513 (Alaska 2016) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, [the plaintiff] ought to be afforded an opportunity to test [the] claim on the merits." (continued...)

Denying leave to amend, on the other hand, is usually justified where there is "undue delay, bad faith or dilatory motive . . . [by] the movant, repeated failure to cure deficiencies by amendments . . . , undue prejudice to the opposing party . . . , [or] futility of the amendment, etc."[38] "[P]rejudice to the opposing party is the predominate factor in determining whether or not to grant leave to amend."[39] Qualifying prejudice does not include an increased likelihood that the amending party will "succeed under the amended [pleading]; presumably, that is the purpose of any amendment offered by a [party]."[40] Prejudice is more likely to be shown by undue delay, expense, or the lack of an opportunity to collect and present evidence.[41]

Here, although DOC failed to present any explanation, let alone justification, for its initial failure to deny the negligence per se claim, the court could reasonably conclude that the failure was due to simple oversight by counsel. The amendment allowed the claim to be litigated on its merits — the preferred route for judicial decision-making. Ebli does not argue that he was unduly prejudiced by the amendment, which came months before the close of discovery and the deadline for filing

---

[37]     (...continued)
(quoting *Miller*, 102 P.3d at 295)).

[38]     *Id.* at 512 (alterations in original) (quoting *Patterson v. GEICO Gen. Ins. Co.*, 347 P.3d 562, 569 (Alaska 2015)).

[39]     *Miller*, 102 P.3d at 294.

[40]     *Wright v. Vickaryous*, 598 P.2d 490, 496 (Alaska 1979).

[41]     *Alderman v. Iditarod Props, Inc.*, 32 P.3d 373, 395 (Alaska 2001) (holding that amendment allowed after the close of evidence was unduly prejudicial where defendant lacked opportunity to present evidence relevant to new claim); *Shooshanian v. Wagner*, 672 P.2d 455, 458 (Alaska 1983) ("Among the factors to be considered in evaluating prejudice to the opposing party are the added expense if the motion is granted and whether trial will be significantly more burdensome or lengthy.").

dispositive motions. And we do not see that allowing parties "to amend their answer anytime they failed to deny an averment in a pleading" would amount to "repealing the existing Civil Rule 8(d)," as Ebli argues; Rule 8(d) continues to have force when parties fail to timely amend their pleadings or when attempts to amend are properly denied. We conclude that the court did not abuse its discretion by allowing DOC to amend its answer to deny Ebli's negligence per se claim.

### C. The Superior Court Did Not Abuse Its Discretion By Denying Ebli's Motion To Amend His Complaint.

Ebli argued in his motion for summary judgment that the visitation restrictions violated not only his constitutional rights but also those of Pittman and the Arthurs. Because his complaint failed to allege claims on behalf of others, he asked the superior court for leave to amend his complaint to include them. The court denied Ebli's motion because Pittman and the Arthurs did "not have a cognizable claim." Ebli argues that this was error. But we conclude that the superior court did not abuse its discretion in denying Ebli leave to amend because amendment would have been futile;[42] Ebli does not have standing to assert the constitutional rights of others in this context.[43]

"Standing is a rule of judicial self-restraint based on the principle that courts should not resolve abstract questions or issue advisory opinions."[44] A party has

---

[42] *Krause v. Matanuska-Susitna Borough*, 229 P.3d 168, 174 (Alaska 2010) ("It is within a trial court's discretion to deny such a motion where amendment would be futile because it 'advances a claim or defense that is legally insufficient on its face.' " (quoting *Hallam v. Alaska Airlines, Inc.*, 91 P.3d 279, 287 (Alaska 2004))).

[43] *See Zaverl v. Hanley*, 64 P.3d 809, 819 n.25 (Alaska 2003) ("We can affirm on alternative grounds apparent from the record.").

[44] *Friends of Willow Lake, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Aviation & Airports*, 280 P.3d 542, 546 (Alaska 2012) (quoting *Law Project for*
(continued...)

"interest-injury" standing when the party has "a sufficient personal stake in the outcome of the controversy and an interest which is adversely affected by the complained-of conduct."[45] Interest-injury standing allows Ebli to argue that the visitation restriction violates his own constitutional rights. But the situations in which a party has standing to protect the constitutional rights of others are limited.[46]

Third-party standing usually requires the existence of a "special relationship . . . between plaintiff and third party, such as [a] parent asserting [a] minor child's constitutional rights."[47] No such special relationship is evident in this case. And Pittman and the Arthurs are not dependent on Ebli to protect their rights; they are adults who are presumably able to sue on their own behalf but have not chosen to do so in this litigation.[48]

---

[44]    (...continued)
*Psychiatric Rights, Inc. v. State*, 239 P.3d 1252, 1255 (Alaska 2010)).

[45]    *Id.* (quoting *Keller v. French*, 205 P.3d 299, 304 (Alaska 2009)).

[46]    *Law Project for Psychiatric Rights*, 239 P.3d at 1255 n.12 ("Under the interest-injury approach, a litigant can have standing either to protect his own rights, or, in rare cases, to protect the rights of third parties by acting in a representative capacity." (quoting *Foster v. State*, 752 P.2d 459, 466 (Alaska 1988) (Moore, J., concurring))).

[47]    *Friends of Willow Lake*, 280 P.3d at 546 n.12 (citing *State ex rel. Dep'ts of Transp. & Labor v. Enserch Alaska Constr., Inc.*, 787 P.2d 624, 630 n.9 (Alaska 1989)).

[48]    *Cf. Gilbert M. v. State*, 139 P.3d 581, 587 (Alaska 2006) (concluding that child's grandfather lacked standing to challenge termination of mother's parental rights because mother was adult who had chosen not to assert those rights herself). Ebli argues that Pittman and Arthur are unable to assert their own rights because DOC's policy requires that the prisoner, not the prospective visitor, grieve the restriction through the administrative process, and "normal citizen[s]" would read DOC's communications as barring relief in any other forum. But DOC did not purport to block Pittman's and the Arthurs' access to the courts.

Because it would have been futile for Ebli to amend his complaint to assert violations of third-party rights, the superior court did not abuse its discretion by denying Ebli's motion to amend.

## V.    CONCLUSION

The superior court's judgment is AFFIRMED.