*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MICHAEL D. BRANDNER, | ) | |
| | ) | Supreme Court No. S-15633 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-11-10914 CI |
| v. | ) | |
| | ) | O P I N I O N |
| ROBERT J. PEASE, M.D., | ) | |
| PROVIDENCE ALASKA | ) | No. 7066 – November 25, 2015 |
| ANESTHESIA GROUP, and | ) | |
| PROVIDENCE ALASKA MEDICAL | ) | |
| CENTER, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Charles W. Coe, Law Office of Charles W. Coe, Anchorage, for Appellant. Roger F. Holmes, Biss & Holmes, Anchorage, for Appellees Robert J. Pease, M.D. and Providence Alaska Anesthesia Group. Robert J. Dickson and Christopher J. Slottee, Atkinson, Conway & Gagnon, Anchorage, for Appellee Providence Alaska Medical Center.

Before: Fabe, Winfree, and Bolger, Justices. [Stowers, Chief Justice, and Maassen, Justice, not participating.]

BOLGER, Justice.

## I.    INTRODUCTION

A cardiac patient who underwent open heart surgery sued the anesthesiologist and medical providers involved in the surgery. The superior court dismissed the patient's claims on summary judgment, concluding that the patient had offered no admissible evidence that the defendants breached the standard of care or caused the patient any injury. On appeal the patient relies on his expert witness's testimony that certain surgical procedures were suboptimal and that patients generally tend to have better outcomes when other procedures are followed. But we agree with the court's conclusion that this testimony was insufficient to raise any issue of material fact regarding whether the defendants had violated the standard of care in a way that caused injury to the patient. We also affirm the court's orders involving attorney's fees and costs.

## II.   FACTS AND PROCEEDINGS

### A.    Heart Surgery

Dr. Michael Brandner suffered a heart attack in September 2009 and was admitted to Providence Alaska Medical Center (the Medical Center) for emergency bypass surgery. Dr. Kenton Stephens was the cardiac surgeon who performed the operation; Dr. Robert J. Pease administered anesthesia. Dr. Brandner is also a medical doctor, licensed to practice plastic and reconstructive surgery.

The surgery lasted six hours. At the outset Dr. Pease intubated Dr. Brandner on his second attempt and used the drug propofol to induce anesthesia. Shortly thereafter Dr. Brandner's blood pressure precipitously dropped, but according to Dr. Stephens, Dr. Brandner did not suffer complete cardiac arrest. Dr. Stephens performed CPR while additional drugs were administered to counteract the drop in blood pressure. Dr. Brandner's blood pressure ultimately stabilized, and the operation continued.

Dr. Pease then placed a transesophageal echo (TEE) probe in Dr. Brandner's esophagus to take ultrasonographic pictures of his heart and obtain diagnostic information about its condition. The TEE probe soon failed, and Dr. Pease then notified Dr. Stephens of this failure. According to Dr. Stephens's deposition testimony, he responded by saying, "Okay, well, I'm pressing on with the operation, do what you can." The TEE probe was not replaced.

Dr. Stephens performed a six-vessel bypass. Dr. Brandner survived the operation and was discharged 12 days later. In his notes from a follow-up appointment about a week after discharge, Dr. Stephens indicated that "[Dr. Brandner] has been progressing quite well." Dr. Stephens also indicated that Dr. Brandner could return to full activity within six weeks of surgery and authorized him to return to his plastic surgery practice. In March 2011 Dr. Stephens wrote a letter on Dr. Brandner's behalf indicating that "[h]is recovery has been quite exemplary" and that "he had steadily returned to practice."

## B.    Proceedings

In September 2011 Dr. Brandner filed a complaint against Dr. Pease, Providence Anchorage Anesthesia Group (the Anesthesia Group), and the Medical Center.[1] Dr. Brandner alleged that "[t]he administration of anesthesia performed by Dr. Robert J. Pease was below the standard of care, . . . was negligently and recklessly performed[,]" and "cause[ed] [Dr. Brandner] to sustain permanent injuries." He also alleged that the Anesthesia Group and the Medical Center were vicariously liable for Dr. Pease's actions. Dr. Brandner alleged that he "suffered severe and permanent

---

[1]    Dr. Pease and the Anesthesia Group are jointly represented by the same firm; the Medical Center has separate representation and has filed independent briefing. But because these three parties' interests, arguments, and evidence are generally aligned, we usually refer to them together as "the providers" throughout.

injuries, loss of past and future wages, . . . [and] loss of enjoyment of life[,]" and that he "incurred past and future medical expenses[.]"  In response to interrogatories, Dr. Brandner  specifically alleged "[i]njury to and loss of myocardium with severely compromised cardiac function and reserve"; "[i]njury to brain with noticeable loss of short term memory function as demonstrated on testing"; and "[s]evere de-conditioning, loss of calcium, with associated muscoloskeletal problems, displaced sternal incision/wound with prolonged healing and continued pain, as well as hemorrhoids requiring surgery and with ongoing problems."

In February 2012 the providers jointly moved for summary judgment, arguing that the "lawsuit must be dismissed with prejudice unless [Dr. Brandner] can produce an affidavit from a qualified expert claiming Dr. Pease failed to meet the standard of care, [and] this failure caused or contributed to his injuries."  The motion was supported by the affidavit of a board-certified anesthesiologist specializing in cardiovascular anesthesia who attested that "[t]he medical care provided by Dr. Pease to [Dr. Brandner] was appropriate in all respects and met the [s]tandard of [c]are."

In July 2012 Dr. Brandner submitted the affidavit of Dr. Steven Yun, a board-certified anesthesiologist, in connection with his opposition to the providers' motion for summary judgment.  Dr. Yun attested that the "treatment, care[,] and services provided by . . . Dr. Robert Pease[] were suboptimal and contributed to [Dr. Brandner's] prolonged and delayed recovery."  Specifically, Dr. Yun stated that "in all medical probability,"  (1) "[p]ropofol was not the optimal choice" of induction agent and its use "led directly to . . . [Dr.] Brandner's cardiac arrest,"[2] (2) the "difficulty in securing [Dr.] Brandner's airway . . . directly contributed to [his] cardiac arrest," and (3) the

---

[2]    As noted above, Dr. Stephens denied that Dr. Brandner suffered complete cardiac arrest.

"amount of damage to [Dr. Brandner's] heart, [the] time to hook up the by-pass machine, [and] the extent of surgery performed would have been reduced by the use of a TEE [probe] throughout his surgery." Following the submission of this affidavit, the providers withdrew their summary judgment motions.

In September 2013 Dr. Brandner was indicted in federal court on seven counts of wire fraud.[3] The grand jury charged him with attempting to conceal millions of dollars in assets from his wife during divorce proceedings.

In January 2014 the parties deposed Dr. Yun. During the deposition Dr. Yun admitted that although he was a practicing anesthesiologist, he had not practiced *cardiovascular* anesthesia or used a TEE probe since about 2001. He also stated that he was not qualified under the current standard of care to practice cardiovascular anesthesia because he lacked certification in the use of TEE probes.

With regard to Dr. Brandner's surgery, Dr. Yun reiterated his opinion that the use of propofol and the failure to intubate Dr. Brandner on the first attempt were "suboptimal," but he refused to say that either fell below the standard of care. Dr. Yun did state that the failure to replace the TEE probe fell below the standard of care and that cardiac patients generally tend to have better outcomes when a TEE probe is used during surgery. But he repeatedly declined to draw any conclusions about whether the lack of a TEE probe caused harm to Dr. Brandner specifically, explaining, "I think that goes a little beyond my area of expertise." Dr. Yun also confirmed that his affidavit, which stated that Dr. Brandner's outcome would have been improved by the use of a TEE probe throughout surgery, was based on his "generalized understanding" of the utility of TEE probes — not his specific understanding of Dr. Brandner's situation.

---

[3]     *See* 18 U.S.C. § 1343 (2012).

In February 2014 the providers jointly moved to exclude Dr. Yun's testimony, arguing that Dr. Yun was not a qualified expert in the field of cardiovascular anesthesia. While this motion was still pending, and less than a month before trial was set to begin, Dr. Brandner requested a continuance. Citing the ongoing criminal proceedings against him, Dr. Brandner argued that "he [would not be able to] testify []or explain his circumstances" and that "exercising his right to remain silent is prejudicial even in a civil case" because "[i]f he is acquitted and/or the charges are dismissed, his current criminal charges become irrelevant and . . . [in]admissible under Evid[ence] Rule 404(b)." He also acknowledged the providers' motion to exclude Dr. Yun and stated that "[i]f [Dr. Yun] is struck from being a witness, the trial cannot proceed."

The providers opposed Dr. Brandner's request for a continuance. The Medical Center argued that postponing the trial was unnecessary because Dr. Brandner's "substantial rights" would not be violated:[4] "The [criminal proceedings] . . . do not prevent [Dr. Brandner] from putting on his evidence concerning his . . . surgery, the results from the surgery, his expert's opinions (to the extent that [the] trial court allows that testimony), and his testimony on damages" — the essential elements of his case. The Medical Center also argued that Dr. Brandner's request was dilatory because his indictment had been issued five months before and he could have moved to continue trial at any time during the intervening months. The Anesthesia Group noted that it had hired an additional physician "at great expense . . . to cover the two weeks Dr. Pease is expected to be in trial" and that two out-of-state expert witnesses had already rearranged their schedules and purchased tickets to attend trial in Anchorage.

---

[4] *See Wagner v. Wagner*, 299 P.3d 170, 175 (Alaska 2013) ("A refusal to grant a continuance constitutes an abuse of discretion 'when a party has been deprived of a substantial right or seriously prejudiced.' " (quoting *Siggelkow v. Siggelkow*, 643 P.2d 985, 987 (Alaska 1982))).

Although the superior court called Dr. Brandner's motion to continue "dilatory," "inexplicable," and "inconvenien[t] [to] opposing litigants, opposing attorneys, and the [c]ourt," the court "reluctantly" granted his request. But the court ordered Dr. Brandner to pay the actual out-of-pocket costs the Anesthesia Group incurred as a result of postponing trial. The court later reconsidered this costs award on Dr. Brandner's motion and confirmed its decision to award costs. But the court reduced the award after learning that the Anesthesia Group's billings included costs that were avoidable since Dr. Pease was still available to work, including "travel, hotels, car rentals, per diem, overtime," and other costs associated with the substitute anesthesiologist. In addition the court granted the providers' motion to exclude Dr. Yun's testimony after finding that Dr. Yun was not a practicing, board-certified cardiovascular anesthesiologist. Dr. Brandner then asked the court to reconsider its exclusion of Dr. Yun's testimony, contending that "there is no such thing as board certification in cardiovascular anesthesia and use of the TEE probe is allowed by anesthesiologists without any certification."

In March the providers again moved for summary judgment, supporting their motions with four affidavits. Two of these affidavits were from board-certified anesthesiologists who asserted that Dr. Pease's actions met the standard of care. In their motions the providers argued that, because the court had excluded Dr. Yun's testimony, Dr. Brandner had no expert to testify about the appropriate standard of care. In the alternative they argued that Dr. Yun's deposition testimony, even if admitted in its entirety, did not raise any genuine issues of material fact, because there was "no admissible evidence that any of [Dr. Pease's] actions [including the failure to replace the faulty TEE probe] caused injury to Dr. Brandner."

The superior court granted the providers' summary judgment motions. Although acknowledging that its previous order excluding Dr. Yun was based on the

erroneous premise that Alaska recognizes board certification for the subfield of cardiovascular anesthesia, the court nonetheless excluded Dr. Yun's testimony. The court also ruled that even if Dr. Yun were qualified as an expert witness, summary judgment would still be warranted because Dr. Yun did not causally connect any of Dr. Pease's allegedly negligent acts to any of Dr. Brandner's claimed injuries.

The providers moved for Alaska Civil Rule 82 attorney's fees and costs. The superior court granted their requests but reduced the awards slightly from the requested amount.

Dr. Brandner appeals.

## III.   STANDARD OF REVIEW

"We review rulings on motions for summary judgment de novo, 'reading the record in the light most favorable to the non-moving party and making all reasonable inferences in its favor.' "[5]  "We 'will affirm a grant of summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.' "[6]   "We may affirm the superior court on any basis supported by the record, even if that basis was not considered by the court below or advanced by any party."[7] "We review a trial court's fact-based determinations regarding whether

---

[5]     *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014) (quoting *Witt v. State, Dep't of Corr.*, 75 P.3d 1030, 1033 (Alaska 2003)).

[6]     *Maness v. Daily*, 307 P.3d 894, 900 (Alaska 2013) (quoting *Russell ex rel. J.N. v. Virg-In*, 258 P.3d 795, 801-02 (Alaska 2011)).

[7]     *Smith v. Stafford*, 189 P.3d 1065, 1070 (Alaska 2008) (quoting *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006)).

attorney's fees are reasonable for an abuse of discretion."[8] However, "[w]e review de novo whether the superior court correctly applied the law in awarding attorney's fees."[9]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Granting The Providers' Summary Judgment Motions.

In a suit alleging negligence or willful misconduct by a health care provider, AS 09.55.540(a) requires a plaintiff to prove by a preponderance of the evidence:

> (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;
>
> (2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and
>
> (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

"In medical malpractice actions . . . the jury ordinarily may find a breach of professional duty only on the basis of expert testimony."[10]

---

[8]     *Froines v. Valdez Fisheries Dev. Ass'n*, 175 P.3d 1234, 1236 (Alaska 2008) (citing *Marron v. Stromstad*, 123 P.3d 992, 998 (Alaska 2005)).

[9]     *Dearlove v. Campbell*, 301 P.3d 1230, 1233 (Alaska 2013) (citing *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001)).

[10]     *Trombley v. Starr-Wood Cardiac Grp., PC*, 3 P.3d 916, 919 (Alaska 2000) (omission in original) (quoting *Kendall v. State, Div. of Corr.*, 692 P.2d 953, 955 (Alaska (continued...)

The superior court granted summary judgment in favor of the providers under two independent rationales. First, the court concluded that Dr. Brandner's only expert, Dr. Yun, was not qualified to testify as an expert in cardiovascular anesthesia. Second, the court concluded that, even if Dr. Yun were qualified to testify as an expert in cardiovascular anesthesia, his testimony "did not make a clear causal connection between the alleged malpractice and Dr. Brandner's injuries under [any] of the stated theories of liability."

Dr. Brandner contests both of these conclusions. With respect to the court's second conclusion, Dr. Brandner argues that if Dr. Yun had been found qualified to testify as an expert in cardiovascular anesthesia, then there would have been genuine issues of material fact regarding all three alleged instances of malpractice: the use of propofol, the two intubation attempts, and the failure to use a working TEE probe throughout the surgery.

**1.      Dr. Brandner produced no expert testimony demonstrating that the standard of care had been breached with regard to his propofol and intubation malpractice claims.**

Dr. Brandner contends that "[t]here is a genuine dispute of fact as to whether the use of the drug propofol and the second intubation attempt were *suboptimal*; taken together these [support] Dr. Yun's conclusion that [Dr.] Pease's actions fell below the standard of care." (Emphasis added.) But Dr. Brandner mischaracterizes Dr. Yun's testimony. In his affidavit Dr. Yun stated only that Dr. Pease's failure to use a working TEE probe during surgery fell below the standard of care; he did not make the same claim about Dr. Brandner's propofol and intubation theories or about Dr. Pease's actions generally. And in his deposition testimony Dr. Yun explicitly stated that he "[could not]

---

**10**      (...continued)
1984)).

make the argument that [the use of propofol] was below the standard of care" and that taking more than one attempt to intubate a patient was "suboptimal and . . . not ideal, but not necessarily below the standard of care." Under AS 09.55.540(a) the providers could not have been held liable for either of these alleged acts of malpractice on the basis of Dr. Yun's testimony.

**2. Dr. Brandner produced no evidence to support his claim that the failure to use a working TEE probe throughout the surgery caused his specific injuries.**

Dr. Yun did testify that Dr. Pease's failure to use a working TEE probe — and the Medical Center's alleged failure to have a working backup probe on hand — fell below the standard of care. But the superior court concluded that "Dr. Yun failed to causally connect the TEE shutdown and the physician's decision to proceed without a spare with any injury suffered by [Dr.] Brandner." We agree.

Dr. Brandner argues that Dr. Yun, in his deposition, "describe[d] the effects [that] the [defendants'] negligence caused to [Dr.] Brandner." Dr. Brandner cites several instances in Dr. Yun's deposition testimony where Dr. Yun suggested that Dr. Brandner probably would have had a better outcome if a TEE probe had been used. But when these statements are read in the context of Dr. Yun's full testimony, it becomes clear that Dr. Yun was opining only that *patients in general* tend to have better outcomes when a TEE probe is used — not that the failure to use a working TEE probe throughout the surgery harmed Dr. Brandner specifically. Dr. Yun testified elsewhere in the deposition: "I can't make any specific conclusions. I can only say, in general, that patients who have a TEE probe used in their cardiac surgery tend to do better than those who do not." And when asked whether it was "outside the scope of [his] training and expertise to be able to testify about the impact the surgery had on [Dr.] Brandner in his particular case," Dr. Yun simply replied, "Yes."

As a matter of statistical probability, evidence that patients generally do better with a given treatment does not necessarily provide causal support that a *specific* patient will do better. The United States Court of Appeals for the First Circuit recently examined the logical pitfall inherent in attempting to prove causation with regard to a specific patient based on studies demonstrating correlation among patients in general. An expert witness testified that the *chances* of a patient's recovery increased by over 50% when given a drug, and concluded that therefore, "the plaintiff more likely than not would have recovered had he received the drug." But as that court explained,

> this reasoning is structurally unsound . . . . When a person's chances of a better outcome are 50% greater with treatment (relative to the chances of those who were not treated), that is not the same as a person having a greater than 50% chance of experiencing the better outcome with treatment. *The latter meets the required standard for causation; the former does not.*[11]

In the present case, Dr. Yun stated that "patients who have a TEE probe used in their cardiac surgery tend to do better than those who do not" — in other words, the chances of a better outcome increase when a TEE probe is used. But Dr. Yun provided no specific figures about what percentage of patients do better, in which ways, and by how much. Without this information, Dr. Yun's statements about general patient outcomes provides no support for Dr. Brandner's specific claim that his recovery would have been better had a working TEE probe been used throughout his surgery.

Here the Anesthesia Group presented an expert who stated that the failure to use a working TEE probe had no effect on the surgery, and Dr. Yun declined to offer testimony to the contrary. The uncontested evidence that the lack of a working TEE

---

[11] *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 33 (1st Cir. 2012) (emphasis added).

probe had no impact on Dr. Brandner's specific surgery overrides any marginal relevance of Dr. Yun's testimony about patient outcomes in general.

For these reasons the superior court was correct to conclude that Dr. Yun's testimony provided no evidence that the failure to use a working TEE probe was the likely cause of Dr. Brandner's alleged injuries. Dr. Brandner pointed to no other evidence of causation in his opposition to summary judgment, nor does he cite any such evidence on appeal. We therefore affirm the grant of summary judgment in the providers' favor.[12]

**B.** **The Superior Court Did Not Abuse Its Discretion By Denying Dr. Brandner's Request For Additional Time To Depose The Providers' Experts.**

Prior to the superior court's summary judgment ruling, Dr. Brandner moved to depose Dr. T. Andrew Bowdle, Thomas Vasquez, and Dr. Pease, whose affidavits supported the providers' summary judgment motions. The providers opposed the motion, pointing out that Dr. Brandner had ample time to depose all three witnesses before the discovery deadline. The superior court denied Dr. Brandner's motion as moot because "[his] only expert cannot testify that . . . the lack of a TEE [probe] caused any injury to [Dr.] Brandner." Dr. Brandner contends that this order was an abuse of discretion.

The superior court did not abuse its discretion. Dr. Brandner had produced no evidence of causation, while, in contrast, the providers submitted four affidavits to support their summary judgment motion. Dr. Brandner asked to depose three of the four witnesses, but he did not attempt to depose or strike the testimony of Dr. Beerle, who stated that "[t]he medical care provided by Dr. Pease to [Dr. Brandner] was appropriate

---

[12] Because we affirm the superior court on this basis, we do not reach the issue of Dr. Yun's qualifications as an expert witness.

in all respects and met the [s]tandard of [c]are," and that a working TEE "would not have changed the surgeon's plans to bypass the vessels chosen." Accordingly, even if the superior court had struck the affidavits of Dr. Bowdle, Vasquez, and Dr. Pease in their entirety, the providers would have remained entitled to judgment as a matter of law because Dr. Brandner produced no evidence of causation to counter Dr. Beerle's expert testimony.

**C.      The Superior Court Did Not Abuse Its Discretion By Ordering Dr. Brandner To Reimburse Costs The Anesthesia Group Incurred As A Result Of His Motion To Continue.**

Dr. Brandner moved for a continuance less than one month before trial was set to begin, largely based on criminal charges that were filed five months prior. The superior court reluctantly granted the continuance, but specifically found "that [Dr.] Brandner . . . violated the pre-trial order deadlines by failing to timely file this motion to continue and such violation . . . directly caused . . . costs [to the providers]." The court ordered Dr. Brandner to pay the costs that the Anesthesia Group incurred as a result of the continuance within 30 days. The Anesthesia Group submitted an affidavit stating that its total costs from the continuance were $27,559.38 — $22,559.38 for a temporary anesthesiologist who was hired to cover for Dr. Pease during the originally scheduled trial period and whose contract could not be cancelled, and $5,000 for the cancellation fee for one of its expert witnesses. The court initially ordered Dr. Brandner to pay the Anesthesia Group the entire sum, though the court subsequently reduced the cost award to $24,878 because the Anesthesia Group's billings revealed that the original sum included "travel, hotels, car rentals, per diem, overtime[,] and other avoidable costs" for the temporary anesthesiologist that "[t]he [c]ourt did not intend to award." Despite this reduction, Dr. Brandner contends that the superior court abused its discretion by awarding these costs.

Dr. Brandner argues that it was unfair for him to pay for a temporary anesthesiologist who was "[n]ever needed." He points out that the temporary anesthesiologist was hired to allow Dr. Pease to attend trial, and he claims "revenue or wage loss due to a party attending a trial is not recoverable under any rule, and there was nothing to show that a [temporary anesthesiologist] was needed to replace Dr. Pease, who was available [to work] when the trial was continued." Dr. Brandner further argues that the cost award "opens the doors for parties to claim loss of income to attend trial as a component of damages or as a component of litigation costs." He argues that the court "penalized him for exercising his Fifth Amendment rights." And he contends that the requirement that he pay the Anesthesia Group for their costs within 30 days was "inconsistent with the civil rules" and "amount[ed] to a[n] [unreasonable] sanction." These arguments are unpersuasive.

Alaska Civil Rule 40(e)(2) grants the superior court "significant discretion" in requiring a party moving for a continuance to pay the costs resulting from the delay of trial.[13] Rule 40(e)(2) provides:

> Unless otherwise permitted by the court, application for the continuance of the trial . . . shall be made to the court at least five days before the date set for trial . . . . If such case is not tried upon the day set, *the court in its discretion may impose such terms as it sees fit, and in addition may require the payment of jury fees and other costs by the party at whose request the continuance has been made.* (Emphasis added.)

Recently, in *Cooper v. Thompson*, we affirmed a costs award for "travel, lodging, and . . . attorney's hours of trial preparation that would have to be duplicated" as a result of a

---

[13]     *Cooper v. Thompson*, 353 P.3d 782, 796 (Alaska 2015).

party's request to continue trial.[14]   The purpose of awarding such costs is not to punish the party requesting a continuance but to "require [that] party to pay for these financial costs when it was responsible for the need to continue the trial so close to the date it was scheduled to begin."[15]

It is uncontested that the Anesthesia Group committed to paying these costs under the assumption that the trial would commence on the scheduled date.   The postponement of that trial, which Dr. Brandner requested and the Anesthesia Group opposed, made the costs unnecessary but did not absolve the Anesthesia Group's contractual duty to pay them.   And the Anesthesia Group could have avoided committing to these costs in the first place if Dr. Brandner had moved for a continuance earlier.

For this reason Dr. Brandner is incorrect that the award "opens the doors for parties to claim loss of income to attend trial as a component of damages or as a component of litigation costs."   Affirming the costs award here merely recognizes that when a party's delay in filing a motion to continue causes another party to incur nonrefundable costs that could have been avoided had the motion been filed earlier, the superior court has discretion to assign those costs to the moving party.   It in no way affects the general rule that such costs are normally each party's respective responsibility.[16]

---

[14]     353 P.3d at 796.  As with the Anesthesia Group's costs in the present case, the travel and lodging costs in *Cooper* were not costs an opposing party would normally be required to bear under Rule 79.  *See* Alaska R. Civ. P. 79(f) (listing costs that may be awarded to a prevailing party).

[15]     *Id.*

[16]     *Cf.* Alaska R. Civ. P. 79(f) (list of costs that may be awarded to prevailing party does not include costs associated with grant of continuance, such as fees incurred for cancellation of expert witnesses).

Dr. Brandner is also incorrect that the imposition of these costs was intended to "penalize[] him for exercising his Fifth Amendment rights." The superior court's order explicitly stated: "The delay in filing the motion — not the fact that [Dr.] Brandner had decided to exercise his [Fifth] Amendment rights . . . — is the direct cause of the . . . cost[s] unnecessarily [in]curred . . . ." And when the superior court reduced the costs award on reconsideration, the court reiterated that "[i]t was the [c]ourt's intention to award only costs that could not be avoided because of the *dilatory filing* of the motion to continue." (Emphasis added.) There is simply no evidence in the record that the superior court intended to punish Dr. Brandner for exercising a constitutional right.

Dr. Brandner also argues the requirement that he pay the Anesthesia Group's costs within 30 days was intended to "sanction" him and was "inconsistent with the civil rules." But Rule 40(e)(2) grants the superior court significant discretion to "impose such terms as it sees fit" and to "require the payment of . . . costs by the party at whose request the continuance has been made." Setting a 30-day deadline was within the court's discretion in this matter.

Dr. Brandner finally argues that "[i]f this cost is to be imposed, [he] should at least be allowed to depose the billing department of [the providers'] expert and [the] Anesthesia Group to find out what, if anything, was paid and what income was earned as a result of using a [temporary anesthesiologist] and Dr. Pease [simultaneously] once trial was continued." Dr. Brandner made this argument before the superior court, which rejected it while noting that "[Dr. Brandner] is entitled to a copy of [the] documentary proof of payment, which defendants shall timely provide." The court's order was reasonable. There is little reason to think the demand for anesthesia necessarily increases with the supply of anesthesiologists. And the Anesthesia Group did provide proof of payment, which already resulted in the reduction of the costs award. The court could

reasonably conclude that Dr. Brandner's request for depositions on this matter was excessive and unreasonable.

For these reasons, we affirm the imposition of costs to Dr. Brandner under Rule 40(e)(2).

**D.    The Superior Court Did Not Abuse Its Discretion In Awarding Attorney's Fees.**

The superior court awarded attorney's fees to the providers pursuant to Rule 82, which provides in part that "[i]n cases [resolved without trial] in which the prevailing party recovers no money judgment, the court shall award the prevailing party . . . 20 percent of its actual attorney's fees which were necessarily incurred."[17] Dr. Brandner argues that the awards were excessive and that the court failed to provide explanation for the reasoning behind its awards. These arguments are without merit.

As an initial matter, Dr. Brandner argues that the providers' attorney's fees were facially excessive given that the "case involved [only] six depositions and a limited motion for summary judgment." But this argument ignores the fact that the case nearly went to trial, and that Dr. Brandner claimed damages of approximately $1,681,065 plus $466,905 *yearly* in future lost earning capacity. Thus the superior court could reasonably conclude that the providers' attorneys' total billings, $240,456, were not facially unreasonable.

Dr. Brandner also raises four specific criticisms regarding Dr. Pease and the Anesthesia Group's billings. We reject these arguments as well.

First, Dr. Brandner criticizes Dr. Pease and the Anesthesia Group's attorneys for "reviewing the same chart notes and medical records . . . on multiple occasions." But these documents were the critical evidence in this case, upon which both

---

[17]    Alaska R. Civ. P. 82(b)(2).

-18-                                                              7066

sides' expert testimony relied. Dr. Brandner has not demonstrated that it was unreasonable for the providers' attorneys to review in depth critical documents upon which both sides' experts relied.

Second, Dr. Brandner criticizes the attorneys' billings for "joint meetings with counsel for [the Medical Center], and work with experts not used in this case." But because the providers' interests and legal defenses were largely aligned, it seems reasonable that they would want their attorneys to meet to coordinate legal strategy. As for the experts, Dr. Pease and the Anesthesia Group explained to the court that "[h]ad the case progressed to trial, each [expert] would have testified." Dr. Brandner does not explain why obtaining the opinions of experts not ultimately called to testify at trial was in any way unreasonable in a case that was resolved before trial and turned on expert testimony.

Third, Dr. Brandner criticizes the attorneys for time spent investigating his criminal case, which he claims had "nothing to do with this case." But Dr. Pease and the Anesthesia Group told the superior court that "[t]he defendants were trying to untangle Dr. Brandner's complicated financial picture as a part of defending [against] his multimillion dollar loss of earnings claim," and that "[Dr.] Brandner . . . used his criminal issues as a basis for a last minute continuance[,] which also required the court and the defendants to delve into those issues." Given the relevance of Dr. Brandner's criminal indictment to the case, Dr. Brandner has not demonstrated that it was unreasonable for the attorneys to bill time spent investigating the issue.

Finally, Dr. Brandner criticizes the attorneys for billing time spent preparing the 2012 motion for summary judgment, which was later withdrawn. But Dr. Pease and the Anesthesia Group pointed out that summary judgment was eventually granted for the same reasons advanced in the original summary judgment motion, and they maintained that "[a]ll the work which went into the original motion was utilized

when filing the second, successful summary judgment motion." Dr. Brandner has not demonstrated that the superior court erred in awarding fees for time spent preparing the original summary judgment motion.

In addition to disputing Dr. Pease and the Anesthesia Group's legal billings, Dr. Brandner argues that the attorney's fees awards should be remanded because the superior court provided "no explanation of the reasoning behind [the Medical Center's] award" and granted Dr. Pease and the Anesthesia Group's attorney's fees request "without ruling on [his] objections."

The court was not obliged to provide reasons for rejecting — or accepting[18] — Dr. Brandner's specific billing objections.[19] It is true that "[i]f the [superior] court deviates from [the Rule 82(b) percent award] formula, it must provide a written explanation for doing so."[20] But there is no indication here that the superior court deviated from that formula. Instead, it appears that the superior court determined the "actual attorney's fees which were necessarily incurred,"[21] accepting some of Dr. Brandner's objections in the process, and applied the proper formula to that sum.

---

[18] It appears that the superior court did accept some of Dr. Brandner's objections. The Medical Center reported that it had incurred $110,355.50 in attorney's fees and was entitled to an award of $22,071.10; the court awarded $20,616.10. Dr. Pease and the Anesthesia Group reported that they had incurred $130,100 in attorney's fees and were entitled to an award of $26,020; the court awarded $25,380.

[19] Alaska R. Civ. P. 52(a) ("Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b).").

[20] *Nichols v. State Farm Fire & Cas. Co.*, 6 P.3d 300, 305 (Alaska 2000) (citing Alaska R. Civ. P. 82(b)(3)).

[21] Alaska R. Civ. P. 82(b)(2).

"[T]he [superior] court is under no obligation to give reasons for an award that complies with the percentages expressed in Rule 82(b)(2)."[22]

## V.    CONCLUSION

The superior court did not err in granting summary judgment to the defendants because Dr. Brandner did not produce any evidence that the defendants' actions caused his injuries.  Nor did the superior court abuse its discretion in ordering Dr. Brandner to pay attorney's fees and costs associated with his motion to continue.  We therefore AFFIRM the superior court's judgment.

---

[22]    *Nichols*, 6 P.3d at 305.