*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| RAYMOND LEAHY, | ) | |
| | ) | Supreme Court No. S-16781 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-16-07272 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JOHN CONANT and | ) | |
| CLARE SULLIVAN, | ) | No. 7342 – March 8, 2019 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Raymond Leahy, pro se, Wasilla, Appellant. Mary B. Pinkel, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellees.

Before: Stowers, Chief Justice, Maassen, Bolger, and Carney, Justices. [Winfree, Justice, not participating.]

MAASSEN, Justice.

## I.    INTRODUCTION

A prisoner sued two prison superintendents, claiming that a mail policy instituted by the Alaska Department of Corrections (DOC) violated his religious rights because it prohibited him from writing letters to fellow Muslims in two other prisons. He asked for damages and a declaratory judgment that the mail policy violated the

Alaska Constitution and the federal Religious Land Use and Institutionalized Persons Act (RLUIPA).

DOC rescinded the policy while the case was pending. The superior court granted summary judgment in favor of the superintendents, finding that the prisoner was not entitled to damages because the superintendents had not been personally involved in creating the policy and that his claims for non-monetary relief were mooted by the policy's rescission. The prisoner appeals.

We affirm the superior court's decision that the prisoner is not entitled to damages, though on different grounds. We conclude that the superintendents were entitled to qualified immunity because the prisoner's right to a religious exception from the mail policy was not "clearly established" under existing law. We also affirm the superior court's decision that the prisoner's claim for declaratory relief is moot. Finally, we see no abuse of discretion in the superior court's handling of the prisoner's pro se status or its failure to designate the prisoner as the prevailing party.

## II.    FACTS AND PROCEEDINGS

Raymond Leahy is a prisoner at Goose Creek Correctional Center (Goose Creek). He is a practicing Muslim and identifies himself as the Imam of the "Ummah of Incarcerated Alaskan Muslims." John Conant and Clare Sullivan, the appellees, have served as superintendents of Goose Creek and Spring Creek Correctional Facilities, respectively.

Leahy's complaint arose from a February 2014 DOC directive that prohibited mail between prisoners residing at three correctional facilities: Goose Creek, Spring Creek, and the Anchorage Correctional Complex. Though not in the record, the

directive is described in several affidavits[1] and an implementing memorandum, and its substance is not in dispute. Sullivan attests that the directive was issued by former DOC Commissioner Bryan Brandenburg and stemmed from a concern that prisoners returning from private prisons outside Alaska were involved in gang and drug-trafficking activity and could "use the prison mail system to pass information for planning and carrying out assaults, conducting illegal business and drug activities, as well as recruiting and communicating [gang] activities." The directive contained exceptions for mail to "immediate family members" and co-litigants in criminal cases.

According to Leahy, in June 2015 he attempted to send a letter to a prisoner at Spring Creek who was the Imam in the Spring Creek community. Leahy sent his letter during Ramadan; he explains that the teachings of the prophet Muhammad require that he engage in dialogue with Muslims in "communities outside [his] own" and that he "holds a sincere religious belief that it is obligatory for him to reach out and support fellow Muslims within the Ummah of Incarcerated Alaskan Muslims." DOC returned Leahy's letter to him as undeliverable.

Leahy sought unsuccessfully to meet with Superintendent Sullivan to explain why his letter to the Imam was important to his religious practice. He then filed a grievance, which was denied, and appealed it without success. In June 2016 he filed a complaint in superior court, asserting that DOC's refusal to allow him "to reach out and support fellow Muslims within the Ummah of Incarcerated Alaskan Muslims" placed "a substantial burden on his religious exercise," violating his rights under RLUIPA and the Alaska Constitution and supporting claims for damages and declaratory relief under 42 U.S.C. § 1983. The suit named Conant and Sullivan as defendants in both their official

---

[1] Affidavits were filed by Sullivan and Kevin Horton, who was then acting superintendent of Goose Creek. Horton's affidavit described his knowledge of his predecessor Conant's actions with regard to the 2014 directive.

and individual capacities. It sought a declaration "that the acts and ommissions described herein violate Leahy's rights"; an order that each of the superintendents "pay nominal and punitive damages, in the amount of $20,000.00"; an award of "costs, fees, and postage"; and "any other just and equitable relief [the superior court] deems appropriate."[2]

While the suit was pending — in November 2016 — the 2014 directive was rescinded by new DOC Commissioner Bruce Busby. According to Sullivan, who had become Deputy Commissioner, the directive was rescinded because while "the restriction was appropriate at the time it was issued, it [was] no longer necessary . . . . [since DOC was] now in a better position to monitor inmate mail than [it had been] two years ago, and the threat posed by inmate to inmate mail at present [was] not as great as it [had been] previously." The new policy restricted mail "only on a case-by-case basis"; the restriction was to "be no broader than necessary to address . . . safety or security concerns."

Leahy filed a motion for summary judgment, contending that the 2014 directive had violated his religious rights, that the rescission of the directive meant that he was now "entitled to judgment as a matter of law," and that he was entitled to damages for the past violation. The superintendents filed a cross-motion for summary judgment, arguing that Leahy's claims were now moot, that the superintendents were otherwise entitled to qualified immunity, and that the 2014 directive did not violate Leahy's rights.

The superior court denied Leahy's motion and granted the superintendents' cross-motion. The court reasoned that the superintendents could not be liable for

---

[2]     Although titled "Complaint for Injunctive Relief[,] Declaratory Judgment and Damages," the body of Leahy's complaint, including its prayer for relief, did not request an injunction.

damages under 42 U.S.C. § 1983 because they "did not personally participate in the decision to institute the mail restriction" and that Leahy's claims for declaratory and injunctive relief were moot because of the directive's rescission.

Leahy appeals.

## III.    STANDARD OF REVIEW

"We review grants of summary judgment de novo, drawing all factual inferences in favor of, and viewing the facts in the light most favorable to the non-prevailing party (generally the non-movant)."[3]  We will "affirm grants of summary judgment when there are no genuine issues of material fact, and the prevailing party (generally the movant) was entitled to judgment as a matter of law."[4]  "We may affirm the superior court on any basis supported by the record, even if that basis was not considered by the court below or advanced by any party."[5]

"We review for abuse of discretion 'decisions about guidance to a pro se litigant . . . .' "[6]  Finally, "[w]e review for abuse of discretion a trial court's prevailing party determination," which will be overturned only if it is "manifestly unreasonable."[7]

---

[3]    *Rockstad v. Erikson*, 113 P.3d 1215, 1219 (Alaska 2005).

[4]    *Id.*

[5]    *Brandner v. Pease*, 361 P.3d 915, 920 (Alaska 2015) (quoting *Smith v. Stafford*, 189 P.3d 1065, 1070 (Alaska 2008)).

[6]    *Greenway v. Heathcott*, 294 P.3d 1056, 1062 (Alaska 2013) (quoting *Shooshanian v. Dire*, 237 P.3d 618, 622 (Alaska 2010)).

[7]    *Gov't Emps. Ins. Co. v. Gonzalez*, 403 P.3d 1153, 1160 (Alaska 2017) (quoting *Progressive Corp. v. Peter ex rel. Peter*, 195 P.3d 1083, 1092 (Alaska 2008)).

## IV. DISCUSSION

### A. The Superintendents Were Entitled To Qualified Immunity From Leahy's Damages Claims.

Leahy did not sue the State or DOC; he sued only the two prison superintendents, in both their official and their individual capacities, alleging that they violated his rights under the Alaska Constitution and RLUIPA by "denying [his] correspondence with fellow Muslims in other [DOC] facilities, without justification." The superintendents raised qualified immunity as a defense and argued for it as one ground for summary judgment. The superior court did not rely on that defense when it decided the case, however, holding instead that under 42 U.S.C. § 1983 the superintendents could not be liable for violations of Leahy's religious rights except "upon a showing of personal participation," and Leahy failed to show that the superintendents "personally participate[d] in the decision to institute the mail restriction."

We note first that the superintendents' lack of involvement in the directive's implementation or say in its enforcement is not a defense to a § 1983 claim. "[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order."[8] "[U]nder the Supremacy Clause, [government] officials have an obligation to follow the [U.S.] Constitution even in the midst of a contrary directive from a superior or in a policy."[9] Government officials may thus be liable for damages under § 1983 upon a showing that they acted unreasonably in following a superior's lead, or that they knew or should have

---

[8] *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (quoting *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004)).

[9] *Id.* (first alteration in original) (quoting *N.N. ex rel. S.S. v. Madison Metro. Sch. Dist.*, 670 F. Supp. 2d 927, 933 (W.D. Wis. 2009)).

known that their conduct might result in a violation of the plaintiff's constitutional rights.[10]

That said, the superintendents were nonetheless entitled to summary judgment on Leahy's damages claims because there was no showing that they acted unreasonably in following the directive; they are therefore protected by qualified immunity. We "follow federal precedent for determining whether qualified immunity should be conferred for [official] acts alleged to contravene a statutory or constitutional mandate."[11] "Specifically, [in *Breck v. Ulmer*] we adopted a test established by the United States Supreme Court in *Harlow v. Fitzgerald*," under which "qualified immunity shields public officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "[12] The inquiry is an objective one.[13] "The burden of establishing that a

---

[10]     *Hartsfield v. Lemacks*, 50 F.3d 950, 956 (11th Cir. 1995); *see Estate of Brown v. Thomas*, 771 F.3d 1001, 1005 (7th Cir. 2014) ("Of course if one is told by one's superiors to do something that is obviously illegal, it is no defense that one was just obeying orders; that was a defense conclusively rejected at the Nuremberg trials of Nazi war criminals."). The superior court cited *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) in support of the proposition that § 1983 liability requires "personal participation." But *Taylor* addressed whether superiors who did not participate in, direct, or know about subordinates' constitutional violations could be liable on a "respondeat superior" basis, concluding they could not. *Id.* This case does not present that issue.

[11]     *Breck v. Ulmer*, 745 P.2d 66, 71-72 (Alaska 1987).

[12]     *Maness v. Daily*, 307 P.3d 894, 901 (Alaska 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[13]     *State, Dep't of Health & Soc. Servs., Office of Children's Servs. v. Doherty*, 167 P.3d 64, 69 (Alaska 2007).

right is clearly established falls upon the plaintiff."[14]

### 1. Federal precedent favors the constitutionality of similar mail restrictions.

We conclude that Leahy did not demonstrate the existence of a "clearly established right" of which a reasonable prison official would have known. Alaska case law has not definitively addressed the issue of restrictions on prisoner-to-prisoner mail. And federal law favors the constitutionality of the directive at issue; the United States Supreme Court deferred to a prison system's similar mail restrictions in *Turner v. Safley*, a case with close parallels to this one.[15]

In *Turner*, Missouri prisoners brought a constitutional challenge against a mail policy that only allowed "correspondence between inmates [at different state prisons] . . . if 'the classification/treatment team of each inmate deem[ed] it in the best interest of the parties involved.' "[16] The policy exempted mail sent between family members and mail concerning legal matters.[17] A federal district court held the policy unconstitutional, finding that it was "unnecessarily broad . . . because prison officials could effectively cope with the security problems raised by inmate-to-inmate correspondence through less restrictive means, such as scanning the mail of potentially

---

[14]   *Id.*

[15]   482 U.S. 78 (1987).  We applied the *Turner* analysis in *Larson v. Cooper*, when we considered and rejected a prisoner's claim that limits on physical contact with visitors violated his religious rights under the federal constitution.  90 P.3d 125, 129-31 (Alaska 2004).

[16]   482 U.S. at 81-82.

[17]   *Id.* at 81.

troublesome inmates."[18] The Court of Appeals for the Eight Circuit affirmed.[19]

The Supreme Court reversed. While acknowledging that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," the Court observed that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."[20] The Court concluded that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[21] Such a deferential standard is necessary, the Court reasoned, to ensure that "the difficult judgments concerning institutional operations" are left primarily to prison administrators rather than judges.[22] Factors relevant to determining whether a regulation is reasonable include (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it";[23] (2) "whether there are alternative means of exercising the right that remain open to prison inmates"[24]; (3) "the impact accommodation of the

---

[18] *Id.* at 83.

[19] *Id.*

[20] *Id.* at 84-85.

[21] *Id.* at 89.

[22] *Id.* (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977)).

[23] *Id.* at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).

[24] *Id.* at 90.

asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;"[25] and (4) "the absence of ready alternatives."[26]

The Supreme Court found the Missouri mail restriction constitutional under this test. The Court first cited trial testimony that the restriction "was promulgated primarily for security reasons" — much like those that prompted the directive at issue here[27] — and was "logically connected to these legitimate security concerns."[28] The Court noted that the policy did not "deprive prisoners of all means of expression" because it barred "communication only with a limited class of other people with whom prison officials [had] particular cause to be concerned."[29] It observed that allowing unrestricted mail between prisoners could affect the safety of guards and other prisoners, and "[w]here exercise of a right requires this kind of tradeoff, we think that the choice made by corrections officials — which is, after all, a judgment 'peculiarly within [their] province and professional expertise,' — should not be lightly set aside by the courts."[30] Finally, the Court noted that there were "no obvious, easy alternatives to" the Missouri mail policy; the one identified by the inmates — reviewing all inmate correspondence

---

[25] *Id.*

[26] *Id.*

[27] *Id.* at 91 (discussing testimony about inter-institution mail being "used to communicate escape plans and to arrange assaults and other violent acts" and the attempt to combat gang violence "both by transferring gang members to different institutions and by restricting their correspondence").

[28] *Id.*

[29] *Id.* at 92.

[30] *Id.* at 92-93 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

— "clearly would impose more than a *de minimis* cost on the pursuit of legitimate corrections goals."[31]

        **2.**      **Federal precedent would not lead a state corrections official to believe that the challenged mail policy violated a clearly established right.**

An objective application of the *Turner* analysis to DOC's mail policy leads to a similar conclusion in this case. Sullivan's affidavit explained that the policy was instituted in reaction to concerns "that Alaska inmates, in particular inmates who were returning from private prisons out of state, were affiliated with gangs and involved with drug trafficking" and that they "would use the prison mail system to pass information for planning and carrying out assaults, conducting illegal business and drug activities, as well as recruiting and communicating security threat group ('STG') activities." Addressing such concerns is a legitimate penalogical interest, and there is a rational connection between this interest and the restrictions on prisoner-to-prisoner mail.[32] Leahy had alternative means of exercising his faith's requirement that he communicate with Muslim communities outside his own; the only restriction was on letters to two other prisons.[33]

Less clear is the application to this case of the third and final *Turner* factors — "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and "the absence

---

[31]    *Id.* at 93.

[32]    *See id.* at 89; *Larson v. Cooper*, 90 P.3d 125, 129 (Alaska 2004) ("Prison security is a compelling governmental interest, and limitations on contact visits are rationally related to this interest.").

[33]    *See Turner*, 482 U.S. at 90.

of ready alternatives."[34] In the superior court, Leahy urged that the way to accommodate his constitutional rights was by compliance with the existing regulation, 22 AAC 05.520(c)(1), which contains no restrictions on addressees but rather contemplates DOC review of individual pieces of mail "upon reasonable grounds to believe that the content falls into any of the categories" of content specifically prohibited by the regulation, including, for example, threats, plans for smuggling contraband, coded messages, and unauthorized solicitations. And in fact DOC returned to a method of individualized review after the directive was rescinded. This could imply that accommodating Leahy's asserted right to send mail to other prisoners while still maintaining an appropriate level of security was not particularly challenging in terms of security or "the allocation of prison resources generally."

But Sullivan attested that the directive was rescinded "because, although the restriction was appropriate at the time it was issued, it is no longer necessary," explaining that "[t]he correctional facilities are now in a better position to monitor inmate mail than they were two years ago, and the threat posed by inmate to inmate mail at present is not as great as it was previously." This explanation lacks detail, but it was not disputed on summary judgment, and we may therefore assume it to be true for purposes of our review.[35] We conclude that an analysis of the *Turner* factors leads to the same result in this case as it did in *Turner*.

Courts in some cases have concluded that prisoner's religious rights *are* "clearly established" such that prison officials accused of violating them are not entitled to qualified immunity. In *Hayes v. Long*, the Eighth Circuit affirmed a district court's

---

[34]     *Id.*

[35]     *Alaska Travel Specialists, Inc. v. First Nat'l Bank of Anchorage*, 919 P.2d 759, 762 (Alaska 1996) ("[We] appl[y] [our] independent judgment in reviewing a [trial] court's application of law to undisputed facts.")

decision that prison officials were not entitled to qualified immunity after disciplining a Muslim prisoner who refused to serve pork.[36] The court observed that previous cases in the Arkansas district where the prison was located had "clearly established . . . that Muslim inmates have the right to avoid contact with pork or with any food that has been contaminated by pork" and that the Arkansas Department of Corrections had been a defendant in one such case.[37] Courts have also rejected the immunity defense for prison officials who refused to send mail for prisoners who used an assumed religious name, reasoning that the issue "has been litigated extensively and courts have consistently recognized an inmate's First Amendment interest in using his new, legal name . . . ."[38] But case law shows no similar "clearly established right" in the context of prisoner-to-prisoner mail.

Indeed, because the Supreme Court upheld similar prisoner-to-prisoner mail restrictions in *Turner*, we would be hard pressed to conclude that existing case law would have alerted reasonable corrections officials that a general ban on such correspondence was unconstitutional absent an exception for religious communications. The superintendents therefore had qualified immunity from suit and were entitled to summary judgment on Leahy's damages claims on that basis.

---

[36]     72 F.3d 70 (8th Cir. 1995).

[37]     *Id.* at 72, 74; *see also Williams v. Bitner*, 455 F.3d 186, 191-94 (3d Cir. 2006) (holding that prison official was not entitled to qualified immunity after forcing Muslim prisoner to handle pork when other cases clearly established Muslims' right to avoid such contact).

[38]     *Malik v. Brown*, 71 F.3d 724, 729-30 (9th Cir. 1995); *see also Masjid Muhammad-D.C.C. v. Keve*, 479 F. Supp. 1311, 1327 (D. Del. 1979) (disallowing qualified immunity defense for prison superintendent who refused to deliver mail if addressed to the prisoner only in his adopted Muslim name).

**B.** **Leahy Has No Viable Damages Claims Under RLUIPA Against The Individual Superintendents, And His Declaratory Judgment Claim Is Moot**.

One basis of Leahy's lawsuit was RLUIPA.[39] The cause of action available under RLUIPA for litigants like Leahy is a suit for injunctive or declaratory relief against defendants in their official capacity. Qualified immunity does not bar such a suit under federal law.[40] RLUIPA does not authorize damage awards against states or individual state actors.[41]

In his complaint, Leahy requested a declaratory judgment "that the acts and omissions described herein violate [his] rights under the Alaska Constitution, the [RLUIPA], and the Alaska [DOC's] own Policies and Procedures." He sought summary judgment on this claim for declaratory relief, arguing that despite the directive's rescission the court should "call[] out defendants[] as having violated plaintiff's protected rights." Though conceding in his summary judgment pleadings that any claim

---

[39]    42 U.S.C. § 2000cc et seq. (2012).

[40]    *See Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985) (noting that "personal immunity defenses, such as objectively reasonable reliance on existing law," are unavailable "[i]n an official-capacity action"); *Vance v. Barrett*, 345 F.3d 1083, 1091 n.10 (9th Cir. 2003) ("[A] defense of qualified immunity is not available for prospective injunctive relief."); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989) ("Qualified immunity is an affirmative defense to damage liability; it does not bar actions for declaratory or injunctive relief.").

[41]    *See Sossamon v. Texas*, 563 U.S. 277, 285-86 (2011) (holding that "RLUIPA's authorization of 'appropriate relief against a government,' is not the unequivocal expression of state consent that [the Court's] precedents require" for a finding that the state has waived its sovereign immunity from damages suits (internal citations omitted)); *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) ("RLUIPA does not authorize suits for damages against state officials in their individual capacities because individual state officials are not recipients of federal funding and nothing in the statute suggests any congressional intent to hold them individually liable.").

for injunctive relief had "become moot," he argued in his motion for reconsideration that a declaratory judgment would serve essentially the same purpose: A "declaratory judgment would have satisfied Plaintiff of no future relapse of the ban."

The Declaratory Judgment Act provides in relevant part: "In case of an actual controversy in the state, the superior court . . . may declare the rights and legal relations of an interested party seeking the declaration, whether or not further relief is or could be sought."[42] We have held that "[t]his provision requires declaratory judgment actions to be associated with an actual case or controversy; they do not open the door for hypothetical adjudications, advisory opinions, or answers to moot questions."[43]

We have also held that "[c]laims for declaratory relief are commonly moot when the statute or regulation at issue is no longer in effect or has been amended."[44]

---

[42] AS 22.10.020(g).

[43] *Laverty v. Alaska R.R. Corp.*, 13 P.3d 725, 729 (Alaska 2000); *see also Williams v. Alioto*, 549 F.2d 136, 141 n.4 (9th Cir. 1977) (noting that the mootness doctrine applies in the declaratory judgment context).

[44] *Alaska Judicial Council v. Kruse*, 331 P.3d 375, 380 (Alaska 2014); *see, e.g.*, *Ahtna Tene Nené v. State, Dep't of Fish & Game*, 288 P.3d 452, 458 (Alaska 2012) (holding appeal moot because challenged hunting regulation was "no longer in effect" after having been substantially amended, and noting: "We have long held that challenges to administrative permitting decisions based on rules that are no longer valid are moot, despite the fact that permit opponents seek declaratory judgments that the agency actions were unlawful."); *State, Dep't of Nat. Res. v. Greenpeace, Inc.*, 96 P.3d 1056, 1068 (Alaska 2004) (concluding that appeal from DNR decision to lift stay on issuance of temporary water permit was moot when "the controlling statute and regulation were both amended in 2001, after the permit expired and before the superior court ruled on the stay issue"); *Peninsula Mktg. Ass'n v. State*, 817 P.2d 917, 920 (Alaska 1991) (interpreting statute granting regulatory powers to Board of Fisheries under public interest exception to mootness doctrine but declining to address claims "about the particular regulation in this case" because it was no longer in effect); *Carney v. State Bd. of Fisheries*, 785 P.2d
(continued...)

"This is because '[i]ssuing a decision regarding regulations that are no longer in effect is merely an academic exercise; it provides no explanation of a party's rights under the existing law.' "[45] Leahy does not dispute that the mail policy to which he objects was changed in November 2016 to an individualized-review policy that he finds unobjectionable. Judicial review to determine the constitutionality of the earlier policy, in existence for less than three years and now replaced, would be a purely "academic exercise." The superior court did not err by deciding that Leahy's claim for declaratory relief was moot.[46]

---

[44]     (...continued)
544, 549 (Alaska 1990) (affirming dismissal of claims of set netters whose claims were mooted after State amended regulation to remove restrictions from beach where they fished).

[45]     *Alpine Energy, LLC v. Matanuska Elec. Ass'n*, 369 P.3d 245, 257 (Alaska 2016) (quoting *Ahtna Tene Nené*, 288 P.3d at 457).

[46]     We recognized in *Slade v. State, Dep't of Transp. & Pub. Facilities* that, under federal law, the "voluntary cessation" of a challenged practice might not moot the challenge unless "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." 336 P.3d 699, 700 (Alaska 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). In *Slade* we determined that this test was satisfied by the Attorney General's "unambiguous policy statement," which was binding in *Slade* and which "other litigants [would] be aware of" because of our published order addressing it. *Id.* at 701. The facts here are similar. The Commissioner's express policy as of November 2018 is "that prisoners may correspond with anyone except those persons and businesses limited by this [written] policy." STATE OF ALASKA DEP'T OF CORR. POLICIES & PROCEDURES 810.03 at 1 (2018), http://www.correct.state.ak.us/pnp/pdf/810.03.pdf. Prisoner-to-prisoner mail may not be restricted except as required for reasons of safety or security; restrictions will then be imposed "only on a case-by-case basis," and "[t]he restriction must be no broader than necessary to address the safety or security concerns." *Id.* at § IV(C)(1), (2). The prior policy is explicitly superceded, and the new one is not due for review until November 2023. *Id.* at 1. We conclude that the Commissioner's
(continued...)

**C.    The Superior Court Did Not Abuse Its Discretion With Regard To Leahy's Status As A Pro Se Litigant.**

Leahy asserts that the superior court erred by failing to advise him to add former Commissioner Brandenberg as a defendant and by striking a pleading he filed in response to the superintendents' reply to his opposition to its cross-motion for summary judgment. "In general, pro se litigants are granted considerable leeway with regard to procedural requirements."[47] But while the court "should inform a pro se litigant of the proper procedure for the action he or she is obviously attempting to accomplish,"[48] judges "must be careful to maintain their impartiality" and "may not act as advocates for pro se litigants on substantive legal issues."[49]

Advising a litigant to add a particular party defendant would usually cross the line from procedural advice to substantive advocacy.[50] The superior court did not abuse its discretion by failing to do so. Nor did the superior court abuse its discretion by

_____

[46]     (...continued)
new "unambiguous policy statement" satisfies the test of *Slade*. *See, e.g.*, *Brown v. Buhman*, 822 F.3d 1151, 1167-68 (10th Cir. 2016) ("[W]e have indicated that government 'self-correction . . . provides a secure foundation for mootness so long as it seems genuine.' " (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1118 (10th Cir. 2010))).

[47]     *Greenway v. Heathcott*, 294 P.3d 1056, 1071 (Alaska 2013).

[48]     *Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987).

[49]     *Rae v. State, Dep't of Corr.*, 407 P.3d 474, 479 (Alaska 2017).

[50]     In any event, we note that under our discussion of qualified immunity, above, former Commissioner Brandenberg would have been protected by the defense, and the result of this suit would have been the same. *See Tracy v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 279 P.3d 613, 617-18 (Alaska 2012) (finding no abuse of discretion in superior court's failure to advise plaintiffs they could amend complaint when their claims would have been dismissed regardless).

striking Leahy's response to the superintendents' reply on summary judgment; the response was not authorized by the Civil Rules,[51] and the superior court's obligation to advise pro se litigants of the *proper* procedure does not require it to grant *more* procedural rights than the Rules allow litigants generally.

**D.** **An Argument That Leahy Should Have Been Designated The Prevailing Party Is Waived.**

Finally, Leahy contends that, "[g]iven that [DOC] decided to rescind the ban, after having been served [with this lawsuit], [Leahy] naturally believed he won the case," and he asks that we award him "all costs and fees paid in the course of this case." Though he makes no substantive argument, his claim could be read leniently as one for prevailing party status based on the catalyst theory, which may apply "when a lawsuit brings about relief in a manner other than formal judgment."[52] A party seeking prevailing party status under the catalyst theory "must demonstrate (1) that it achieved the goal of the litigation by succeeding on any significant issue which achieves some of the benefit sought in bringing the suit, and (2) that there is a causal connection between the defendant's action generating relief and the lawsuit."[53]

But Leahy made no prevailing party argument in the trial court. After the superior court granted summary judgment and denied Leahy's subsequent motion for reconsideration, the superintendents moved for entry of final judgment, disclaiming any intent "to seek attorney's fees or costs." Leahy did not oppose the superintendents'

---

[51] Alaska Rules of Civil Procedure Civil Rules 56(c) and 77(b)-(d) contemplate a motion, an opposition, and a reply.

[52] *Interior Cabaret, Hotel, Rest. & Retailers Ass'n v. Fairbanks N. Star Borough*, 135 P.3d 1000, 1008 (Alaska 2006).

[53] *Progressive Corp. v. Peter ex rel. Peter*, 195 P.3d 1083, 1094 (Alaska 2008) (quoting *Interior Cabaret*, 135 P.3d at 1008).

motion, and the court signed a final judgment that made no determination of prevailing party status and awarded no fees or costs.  Having failed to raise a prevailing party argument in the trial court, Leahy cannot raise one for the first time on appeal.[54]

## V.    CONCLUSION

The judgment of the superior court is AFFIRMED.

---

[54]    *See Ivy v. Calais Co.*, 397 P.3d 267, 275 (Alaska 2017).